[L.A. No. 31403. Apr. 30, 1982.]

LOS ANGELES COUNTY TRANSPORTATION COMMISSION, Petitioner, v.
GEORGE U. RICHMOND, as Executive Director, etc., Respondent.

**COUNSEL**

Nossaman, Krueger & Marsh, John T. Knox, Donald E. Burns, Stephen N. Roberts, James C. Powers and Henry S. Weinstock for Petitioner.

Gregory L. Colvin and Polly Thomas as Amici Curiae on behalf of Petitioner.

Ronald A. Zumbrun, John H. Findley and Joseph E. Maloney for Respondent.

Nichols, Stead, Boileau & Lamb, Michael D. Smith and John Howard Sullivan as Amici Curiae on behalf of Respondent.

Carol Benson as Amicus Curiae.

**OPINION**

**MOSK, J.**—The issue in this case is whether the Los Angeles County Transportation Commission (LACTC) may, consistent with the provisions of section 4 of article XIII A of the California Constitution, impose a "retail transaction and use tax" in Los Angeles County with the consent of a majority of the voters, but less than two-thirds of their number.

In 1976, the Legislature created LACTC in order to meet a demand for an efficient public transportation system in the Southern California region. (Pub. Util. Code, § 130301 et seq.) To finance such a system, LACTC was authorized to adopt a "retail transaction and use tax" (*id.*, §§ 130350-130355)[1] limited to one-half of one percent on the sale, storage, or use of tangible personal property in Los Angeles County (Rev. & Tax. Code, §§ 7261, 7262; Pub. Util. Code, § 130350). The tax could not be imposed, however, unless the measure received the approval of a majority of the county's voters who voted in the election. (*Id.*, § 130350.) Any revenues received were to be used for "public transit purposes." (*Id.*, § 130354.) LACTC was not authorized to levy a property tax.

On June 6, 1978, the voters approved Proposition 13 by initiative (now Cal. Const., art. XIII A). Section 4 of article XIII A provides, "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."[2]

---

[1]This tax will hereinafter be referred to as a sales tax.

[2]Sections 1, 2 and 3 of article XIII A provide as follows:

"Section 1. (a) The maximum amount of any ad valorem tax on real property shall

Following adoption of Proposition 13, LACTC enacted a sales tax in accordance with the requirements of the Public Utilities Code, and the voters of the county approved the measure by a 54 percent majority in November 1980. George U. Richmond, LACTC's own executive director, refused to take steps to implement the tax[3] upon the advice of the Attorney General that the measure was not adopted in accordance with the requirements of section 4 because it had not received the approval of two-thirds of the voters (64 Ops.Cal.Atty.Gen. 156 (1981)). LACTC then filed a petition for writ of mandate to compel Richmond to take the measures required of him to implement the tax. Because of the importance of the issues involved and the need for their prompt resolution, we invoked the exercise of our original jurisdiction and issued an alternative writ of mandate (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 808 [114 Cal.Rptr. 577, 523 P.2d 617] and cases cited).

---

not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective.

"Section 2. (a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value,' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-76 full cash value may be reassessed to reflect that valuation. For purposes of this section, the term 'newly constructed' shall not include real property which is reconstructed after a disaster, as declared by the Governor, where the fair market value of such property, as reconstructed, is comparable to its fair market value prior to the disaster.

"(b) The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value.

"(c) For purposes of subdivision (a), the Legislature may provide that the term 'newly constructed' shall not include the construction or addition of any active solar energy system.

"Section 3. From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed."

Section 2 was amended to its present form in 1980. The changes made are not relevant to the issue before us.

[3]The State Board of Equalization is directed by statute to collect the tax upon payment to it by LACTC of the "costs of preparation to administer" collection. (Rev. & Tax. Code, §§ 7270, 7272.) Richmond refused to reimburse the board for those costs.

In *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281], we upheld the validity of article XIII A against a broad range of challenges to its constitutionality. We emphasized, however, that problems which might arise respecting the interpretation of particular provisions of the measure were deferred for resolution in future cases in which the application of such provisions were in issue. This case involves the application of section 4 to the sales tax enacted by LACTC and adopted by a majority of the voters of Los Angeles County. We must decide whether imposition of the tax violates the prohibition against the levy of a "special tax" by a "special district" without a two-thirds vote of the electors. We shall conclude that the tax was validly adopted by a majority vote because LACTC is not a "special district" within the meaning of section 4. As we explain below, the goal of article XIII A is real property tax relief, and a governmental body like LACTC, which does not have the power to levy a property tax, is not the type of "special district" governed by the section.

We begin with the proposition that section 4 is ambiguous in various respects. This court recognized in *Amador* that the language of article XIII A is "imprecise and ambiguous" in a number of particulars. Nowhere is this imprecision more evident than in the language of section 4. The first aspect of the provision which strikes a reader is that its terms are permissive rather than restrictive. That is, it authorizes local entities to adopt "special taxes" on the vote of two-thirds of the electorate, rather than prohibiting them from doing so without the concurrence of that number of voters. Nevertheless, we held in *Amador* that section 4 is actually a limitation on the imposition of "special taxes" because it requires a two-thirds vote for their approval. (22 Cal.3d at p. 220.)[4]

The ambiguity in section 4 extends also to the terms "special taxes" and "special districts." For the purpose of the present case, we consider only the meaning of the words "special districts," for if that term does not encompass LACTC, the two-thirds requirement is inapplicable to

---

[4]Another ambiguity in the language of section 4, which we did not note in *Amador*, is that although the first clause of the provision refers to "Cities, Counties and special districts," in the portion of the sentence that restricts the right to impose "special taxes" to measures which receive the approval of two-thirds of the electorate, only "such district" is referred to. However, the exception at the end of the sentence repeats the reference to all three types of entities, implying that the provision is to apply to cities and counties as well as to special districts.

the sales tax in issue here even if it is a "special tax" within the meaning of the section.

■ The term "special district" has been generally characterized as "a legally constituted governmental entity established for the purpose of carrying on specific activities within definitely defined boundaries." (Sen. Factfinding Com. Rep. on Revenue and Taxation, Intergovernmental Fiscal Relations in Cal. (June 1965) p. 177; see also Crouch & McHenry, Cal. Government (rev. ed. 1949) p. 234; The Impact of Proposition 13 (The Jarvis-Gann Property Tax Initiative) on Local Government Programs and Services, Rep. of Assem. Com. on Local Government and Revenue and Taxation (May 1978) p. 253.)

But this broad definition has been qualified by statute in various contexts. (See, e.g., Gov. Code, §§ 53950, 54775, subd. (n).) Some statutes exclude from the definition of a "special district" "any agency which is not authorized by statute to levy a property tax rate." (Rev. & Tax. Code, § 2215; Gov. Code, § 16271, subd. (d).)[5] A large majority of entities "established for the purpose of carrying on specific activities within definitely defined boundaries" are authorized to levy a property tax to finance their operations. (See Leg. Counsel's Analysis of Cal. District Laws (1965); The Impact of Proposition 13, *op. cit. supra*, p. 253 et seq.) A few, like LACTC, do not have such authority. Richmond urges that we should interpret the term "special districts" as used in section 4 to mean "any unit of local government other than a city or county that is empowered to levy a 'special tax.'"

■ Before considering which of these various definitions is appropriate in the context of section 4, we examine an issue not raised by the parties but which we view as critical to our conclusion: the standard that is proper in interpreting the ambiguous language of section 4.

In *Amador*, we set forth the familiar rules for the construction of a constitutional provision. It should be construed "in accordance with the

---

[5]Both prior to and following the enactment of Proposition 13, section 2215 of the Revenue and Taxation Code has excluded from the definition of "special district" an "agency which is not authorized by statute to levy a property tax rate." (Stats. 1975, ch. 486, § 4, p. 998; Stats. 1980, ch. 801, § 15, p. 2521.) Section 16271, subdivision (d), of the Government Code contains a similar provision.

Richmond argues that these definitions are relevant only to the statutory framework in which they appear. We cite them, however, not to import any of the meanings wholesale into section 4, but to demonstrate that the broad term "special district" has been qualified in various respects so as to exclude certain types of entities.

natural and ordinary meaning of its words.... The literal language ... may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers ..." and the language used must "receive a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people." To this end, if, as here, the provision has been adopted by initiative, ambiguities may be resolved by referring to the ballot summary, the arguments and analysis presented to the electorate, and the contemporaneous construction of the Legislature. (22 Cal.3d at pp. 245-246.)

■ In applying these rules, we cannot overlook the nature and effect of the two-thirds vote requirement set forth in section 4. By its terms, a majority—but less than two-thirds—of the voters statewide[6] has determined that in a local election involving a matter of primarily local interest, a minority of voters can preclude the majority from imposing a "special tax" confined to the taxpayers of the local entity, to finance local projects or services.

The constitutionality of the requirement for an extraordinary majority is not in question. We held in *Amador* (22 Cal.3d at p. 237) that this requirement of section 4 does not violate the equal protection clause of the United States Constitution. Our conclusion was based on the decision of the United States Supreme Court in *Gordon v. Lance* (1971) 403 U.S. 1 [29 L.Ed.2d 273, 91 S.Ct. 1889]. The ruling in *Gordon* resulted in overturning our decision in *Westbrook v. Mihaly* (1970) 2 Cal.3d 765 [87 Cal.Rptr. 839, 471 P.2d 487], in which we had concluded that article XVI, section 18, of the California Constitution, which requires that general obligation bond proposals of cities, counties, and school districts be approved by a two-thirds majority of the voters, violated equal protection of the law. The high court disagreed, reasoning that "in voting to issue bonds voters are committing, in part, the credit of infants and of generations yet unborn, and some restriction on such commitment is not an unreasonable demand." (403 U.S. at p. 6 [29 L.Ed.2d at p. 277].) It held that if the two-thirds vote requirement did not discriminate against any identifiable class of voters, it did not violate the equal protection clause.

We are, of course, bound by this conclusion. But in resolving the meaning of the ambiguous language of section 4, it is appropriate to

---

[6]Proposition 13 was accorded a 64.8 percent vote in the June 1978 primary election. (Statement of Vote, Compiled by Secretary of State, Primary Election June 6, 1978, p. 39.)

consider the substance and effect of the extraordinary majority requirement.

In *Westbrook*, we noted that "the inevitable result of any extraordinary majority requirement is to give to one group of voters a greater influence on the outcome of an election than to another group of comparable size but opposite conviction." It is the functional equivalent of allowing "those citizens who opposed a measure ... to vote twice while those who favored it were limited to only one ballot." (2 Cal.3d at p. 783.) The United States Supreme Court conceded the point in *Gordon*, when it stated that "any departure from strict majority rule gives disproportionate power to the minority." (403 U.S. at p. 6 [29 L.Ed.2d at p. 276].) Moreover, as we observed in *Westbrook*, "a two-thirds requirement is well suited to deter the ... action to which it applies, since it conditions such action on a degree of consensus unusual in our pluralistic society." (2 Cal.3d at p. 792.)

We discern some significance in the fact that section 4 was adopted by the voters throughout the state, whereas the extraordinary majority requirement is imposed on local entities. In theory, a bare majority of voters in a statewide election may decide that the affirmative votes of even 65 percent of the electorate of a local entity are insufficient for adoption of a tax which substantially affects the taxpayers of the local entity. The sales tax enacted here by LACTC is of primary concern to local voters: the taxpayers of the district pay the bulk of the tax with their purchases, rather than the population of the state as a whole; the tax is adopted for the purpose of supporting programs or services for the local population; and it is the electors of the district who demonstrate by a majority vote that they are willing to increase their taxes. Yet because a majority of the voters of the state has determined that a two-thirds vote is required to adopt the tax, the will of the majority of the local voters may not prevail.

The subject of the two-thirds limitation is also of consequence. We are not here concerned with a measure that affects those fundamental rights of individuals which might be endangered in the hands of a majority. In *Westbrook*, we suggested that the extraordinary majority requirement for the issuance of general obligation bonds in article XVI, section 18, may have been intended to "protect property owners from the unrestrained desires of the landless for publicly financed projects." (2 Cal.3d at p. 777.) The sales tax in the present case does not involve such a prospect, nor will it "commit ... the credit of ... generations

yet unborn." (*Gordon* v. *Lance, supra*, 403 U.S. at p. 6 [29 L.Ed.2d at p. 277].) It is a broad-based tax on consumers; it has no relation to property ownership; it does not increase the indebtedness of LACTC; and it may be repealed by the voters of the local entity by a majority vote. (Pub. Util. Code, § 130353.)

The purpose of our discussion is not to throw doubt on the constitutionality of the two-thirds vote requirement in section 4, but rather to establish the framework in which the ambiguity in the language of the provision should be resolved. In view of the fundamentally undemocratic nature of the requirement for an extraordinary majority and the matters discussed above, the language of section 4 must be strictly construed and ambiguities resolved in favor of permitting voters of cities, counties and "special districts" to enact "special taxes" by a majority rather than a two-thirds vote.

In our analysis of section 4, we begin, as we must, with the language of the provision. The exception at the end of the section provides the first indication that the "special districts" referred to are those which have the power to levy a tax on real property. The fact "special districts" are prohibited, even with the consent of two-thirds of the voters, from levying "ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property" implies that the "special districts" referred to are those which may levy a tax on real property. Although this construction is not compelled, it is an appropriate interpretation of the language of the provision because ordinarily the subject matter of an exception is the same as that to which the exception applies.

The material set forth in the voter's pamphlet also provides support for our conclusion. The description of the background and effect of Proposition 13 by the Legislative Analyst strongly suggested to the voters that the term "special districts" in section 4 refers to entities authorized to levy a tax on real property. The analysis begins with "some basic facts" about California property taxes; the first item of information under this heading is that "[u]nder existing law cities, counties, schools and special districts are permitted to levy local property taxes." (Ballot Pamp. Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 6, 1978) p. 56.) The analysis then states that because under the Constitution certain types of local entities, including "special districts," must receive legislative approval in order to impose "special taxes," the ability of such districts, even with local voter approval, "to

*replace* property tax losses resulting from the adoption of this initiative" would be limited. (Italics added, *id.* at pp. 57, 60.) In a similar passage, the analysis tells the voters that "the initiative would restrict the ability of local governments to impose new taxes in order to *replace* the property tax revenue losses." (Italics added, *id.* at p. 60.) Since only those "special districts" which levied property taxes could "replace" the "loss" of such taxes, these statements imply that the "special districts" referred to are those which are authorized to levy a property tax.

Richmond relies on other statements in the ballot pamphlet which, without differentiating between types of local entities, declare that certain taxes by "local government" could not be imposed without a two-thirds vote.[7] These passages, according to Richmond, indicate that all local entities are included in the limitation set forth in section 4. While these excerpts tend to support Richmond's position, they do not compel the conclusion that "special districts" which are not empowered to levy a property tax are affected by section 4, in view of the clear implication to the contrary in other portions of the pamphlet.

The third prong of our inquiry in assessing the intention of the electorate is the interpretation of the term "special districts" by the Legislature following the enactment of Proposition 13.

We can derive no plain guidance from these measures. As we have seen, some statutes enacted following adoption of Proposition 13 exclude entities which do not levy property taxes from the term "special districts." (E.g., Gov. Code, § 16271, subd. (d);[8] Rev. & Tax. Code, § 2215.)[9] On the other hand, section 50077 of the Government Code

---

[7]The summary of the measure by the Attorney General states in part, "Authorizes imposition of special taxes by local government (except on real property) by 2/3 vote of qualified electors." (Ballot Pamp., *op. cit. supra*, p. 56.) Similarly, according to the Legislative Analyst the measure would "authorize local governments to impose certain nonproperty taxes if two-thirds of the voters give their approval in a local election." (*Id.* at p. 56.) The argument of the proponents of the measure states that it "requires all other tax raises to be approved by the people." (*Id.* at p. 58.)

[8]Section 16271, subdivision (d), of the Government Code provides that the term "special district" does not include "any agency which is not authorized to levy a property tax rate, except the Bay Area Pollution Control District." The provision is part of a plan to distribute state funds to local agencies following enactment of Proposition 13.

[9]Section 2215 of the Revenue and Taxation Code defines a "special district" as "any agency of the state for the local performance of governmental or proprietary functions within limited boundaries," but excepts from its terms those agencies which are "not authorized by statute to levy a property tax rate." This provision is contained in chapter 3, part 4, of division 1 of the Revenue and Taxation Code. Chapter 3, is entitled "Reimbursement for Costs Mandated by the State."

employs the term "district" without the qualifying word "special," but it is clear from its context that it was intended to implement article XIII A. Perhaps this statute is most favorable to Richmond's position, since it is designed to implement article XIII A (Gov. Code, § 50075) and defines a "district" broadly as "an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries." (*Id.*, § 50077, subd. (c).) It requires a two-thirds vote of the electorate as a condition for the adoption of "special taxes" (*id.*, § 50077, subd. (a)).

While this broad definition would appear at first blush to include LACTC, there are persuasive reasons why we should not view it as determinative of the question before us. As we have seen, *Amador* held that, although section 4 is cast in permissive terms, it is restrictive in nature in that it limits the right of local entities to adopt "special taxes" by requiring a two-thirds vote for their imposition. In enacting sections 50075 to 50077, the Legislature viewed section 4 as having an affirmative aspect as well, i.e., as affording "districts" a right to levy taxes by a two-thirds vote. These provisions were expressly intended as enabling legislation to fulfill the grant of power in section 4.[10] Since the aim of the legislation was to broaden the rights of local entities to adopt taxes, the application of the definition contained in section 50077 to limit these rights would be unwarranted. There is nothing to indicate that the Legislature intended to withdraw from a local entity like LACTC the power to levy a tax by a majority vote if Proposition 13 did not compel such a restriction.

Richmond asserts that the limitation of "special districts" to local entities which are empowered to levy property taxes violates the spirit and intent of Proposition 13. He relies on our statement in *Amador* that the purpose of sections 3 and 4 of the initiative is to assure that the real property tax relief afforded by sections 1 and 2 is not "withdrawn or depleted" by the levy of other taxes. (22 Cal.3d at p. 231.) From this he argues that to allow some units of local government, like LACTC, to

---

[10]Sections 50075 and 50077 were declared by the Legislature to constitute emergency legislation. In explaining the necessity for the measure to take effect immediately, the Legislature stated that the "passage of Article XIII A of the California Constitution has limited the ability of special districts to fund necessary operations through property taxation, but makes provision for the imposition of special taxes by such districts. In order that special districts be granted the authority to impose special taxes during the 1980-81 fiscal year, it is necessary that this act take effect immediately." (Stats. 1980, ch. 672, § 3, p. 1867.)

impose a "special tax" without the consent of two-thirds of the voters would "erode the effectiveness" of the real property tax relief granted by the initiative.

This argument implies that only by liberally interpreting the language of section 4 to require a two-thirds vote will the object of "effective" property tax relief be achieved. We disagree. To the extent section 4 clearly requires a particular entity to obtain the consent of two-thirds of the voters, it affords the "effective" property tax relief we discussed in *Amador*. However, as we discuss above, there are strong policy reasons for holding that if, as here, the intention of the voters to require a two-thirds vote is not clear, a majority is to be deemed sufficient for the valid adoption of a "special tax."

Nor are we impressed with a suggestion that our interpretation of section 4 could result in the wholesale avoidance of the purpose of article XIII A by the Legislature, which could reorganize existing "special districts" to remove their property-taxing power or create new ones without such power, thereby allowing them to adopt a "special tax" by majority vote. We cannot assume that the Legislature will attempt to avoid the goals of article XIII A by such a device. In any event, that problem can be dealt with if and when the issue arises. The legislation creating LACTC and granting it the power to levy only a sales tax antedated Proposition 13 by two years. Thus, there can be no claim here that the Legislature was attempting to evade the restrictions imposed by section 4.

We hold that the sales tax in issue here was validly adopted by a majority vote and that, therefore, Richmond must take appropriate steps to implement its imposition.

Let a peremptory writ of mandate issue as prayed.

Bird, C. J., and Broussard, J., concurred.

**KAUS, J.**—I concur in the judgment.

▮ Although the language of section 4 of Proposition 13 (art. XIII A) is far from clear, the description and discussion of this provision in the election pamphlet which was before the voters suggest to me that the purpose of this section was simply to limit the authority of a city, county or special district to impose new "special taxes" *to replace prop-*

*erty tax revenue* that the city, county or special district lost as a result of the other portions of Proposition 13. (See also *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 230-231 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 863 [167 Cal.Rptr. 820, 616 P.2d 802]; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 983 [156 Cal.Rptr. 777].) Given this purpose, it appears sensible under ordinary principles of constitutional interpretation to construe section 4's reference to "special districts" to apply only to those special districts which had the authority to impose property taxes, for it is only those districts which could suffer *property tax losses* for which the new special tax revenues would serve as a replacement.[1] Inasmuch as the plaintiff district never had the authority to levy a property tax, I agree with the court that the limitations of section 4 do not apply to it.

Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

Article XIII A, section 4 of the California Constitution provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

The majority concludes that this constitutional limitation does not bar a retail transaction and use tax (sales tax) which is to be operative throughout Los Angeles County and which was approved by only 54 percent of its voters. The majority's reason is that the entity *initiating* the tax, Los Angeles County Transportation Commission (LACTC), is not a "special district" within the purview of section 4. Accordingly, the majority would sustain the tax "even if it is a 'special tax' within the meaning of the section." (*Ante*, p. 202.)

I do not agree and conclude, to the contrary, that the ordinance is invalid both because the tax it purports to enact is a "special tax" and

---

[1]This definition of "special district" is not unique to this context. As the court notes, a number of statutes explicitly provide that "'[s]pecial district' does not include any agency which is not authorized by statute to levy a property tax rate." (Rev. & Tax. Code, § 2215; Gov. Code, § 16271, subd. (d).)

because it has been adopted by a "special district" without the approval of two-thirds of the qualified voters thereof, in violation of article XIII A, section 4.

In reaching its conclusion that LACTC is not a "special district," the majority has applied a new rule of "strict construction" of constitutional language. (*Ante*, p. 205.) The primary feature of this new interpretive rule appears to be that any ambiguities in the constitutional provision before us must be resolved in favor of allowing local government to *evade* the clear two-thirds voter approval requirement by which the people chose to limit additional or increased tax levies by such government. Beyond labelling the constitutional restriction as "fundamentally undemocratic" (*ibid.*), the majority cites no authority for applying such a rule of strict construction within this context. I have found no such authority. To the contrary, both the United States Supreme Court (*Gordon* v. *Lance* (1971) 403 U.S. 1, 7 [29 L.Ed.2d 273, 277, 91 S.Ct. 1889]) and our own court (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 237 [149 Cal.Rptr. 239, 583 P.2d 1281]) have fully upheld, against equal protection challenges, the so-called "super-majority" voter approval requirement. (*Ante*, pp. 203-204.) Whether or not it is financially wise to do so, the people, through their Constitution, have a *legal* right to so limit the revenue powers of local government.

With due deference to my colleagues, I believe that the patent inconsistencies of the majority's analysis suggest that the new rule has been adopted more as a means to an end than to vindicate any principle, democratic or otherwise. In my view, neither the adoption of a new rule of strict construction within this context, nor its application which obscures LACTC's identity as a "special district" within the constitutional meaning, is legally sound.

In *Amador*, we described the appropriate principles of constitutional construction within the specific context of article XIII A. Contrary to the novel suggestion of the present majority that the constitutional language be strictly construed, in *Amador* we declared that a constitution "'is *not* to be interpreted according to *narrow* or super-technical principles, but *liberally* and on broad general lines, so that it may accomplish in full measure the objects of its establishment and so carry out the great principles of government.' (*Stephens* v. *Chambers* (1917) 34 Cal. App. 660, 663-664 . . . ." (22 Cal.3d at pp. 244-245, italics added.) We further observed: "California courts have held that constitutional and

other enactments must receive a *liberal*, practical common-sense construction which will meet changed conditions and the growing needs of the people. [Citations.] A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words. [Citation.]" (*Id.*, at p. 245, italics added.) Indeed, even "the literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]" (*Ibid.*)

In addition to affirming the foregoing general principles of constitutional construction in *Amador*, we also specifically examined their application to the adoption of article XIII A by the people under their powers of initiative and referendum. Noting the constitutional reservation of such powers to the people so that they may alter or reform government when the public good may require (Cal. Const., art. IV, § 1), we concluded, therefore, that "'"[the] power of initiative must be *liberally* construed ... to promote the democratic process."'" (*San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 210, fn. 3 ....)" (22 Cal.3d at p. 219, italics added; accord *Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 863 [167 Cal.Rptr. 820, 616 P.2d 802]; see *Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278].)

It is these long established rules of constitutional interpretation, I submit, rather than the majority's newly fashioned rule of "strict construction," which should control our analysis here. Expressed most succinctly, our primary goal in interpreting constitutional language is "to give full effect to the framers' objective ...." (*Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 660 [166 Cal.Rptr. 674].)

What, then, was the objective of the framers of article XIII A?

In *Amador* we stressed that "article XIII A consists of four major elements, a real property *tax rate* limitation (§ 1), a real property *assessment* limitation (§ 2), a restriction on *state* taxes (§ 3), and a restriction on *local* taxes (§ 4)." (22 Cal.3d at p. 231, italics in original.) We concluded that these four elements formed "an interlocking 'package' deemed necessary by the initiative's framers *to assure effective real property tax relief*.... [S]ince any tax savings resulting from the operation of sections 1 and 2 could be withdrawn or depleted by additional or increased state or local levies other than property taxes, sections 3 and 4 combine to place restrictions upon the imposition of such taxes." (*Ibid.*, italics added.)

Acknowledging that the limitations of sections 1 and 2 could well substantially reduce revenues from real property taxes by reason of their new tax rate and assessment restrictions, we also noted, however, that "local agencies retain full authority to impose 'special taxes' (other than certain real property taxes) *if approved by a two-thirds vote of the 'qualified electors'*" (22 Cal.3d at p. 226, italics added). We further observed that "it seems evident that section 4 assists in preserving home rule principles by leaving to *local* voters the decision whether or not to authorize 'special' taxes to support *local* programs." (*Ibid.*, italics in original.)

Thus, while we did not specifically define in *Amador* either "special districts" or "special taxes" as those terms are used in section 4, we clearly identified the *objective* of the framers of article XIII A as seeking "to assure effective real property tax relief." (*Amador, supra,* 22 Cal.3d at p. 231.) Further, our analysis of the interrelationship of the four constitutional sections also clearly described the *means* selected by the authors of article XIII A to obtain the relief sought, namely, by the imposition through sections 3 and 4 of the amendment of a two-thirds majority approval requirement on "additional or increased state or local levies" in order to prevent the withdrawal or depletion of the reduction in real property taxes mandated by sections 1 and 2 thereof. (*Ibid.*) The gains to the taxpayers obtained by sections 1 and 2 were protected from dilution by sections 3 and 4.

We nowhere suggested in *Amador*, on the other hand, that it was *only* those state or local agencies otherwise empowered to levy real property taxes which were barred by the amendment from frustrating the objective of property tax relief. The majority frankly acknowledges that such a construction "is not compelled." (*Ante*, p. 205.) I agree. Nonetheless, the majority finds that interpretation "appropriate." (*Ibid.*) Its construction seems to me very dubious. No such interpretative refinement is suggested by the language of article XIII A and, in my view, the majority errs in attempting to find some exception to the general restriction of section 4.

The majority's claim that LACTC's sales tax is not a "replacement" for real property taxes because LACTC has never previously had authority to impose real property taxes is not reasonable. LACTC cannot deny that the improvement of public transportation in Los Angeles County is a proper function of government which could well be funded by receipts from a real property tax imposed by the county. (See *Sol-*

*vang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545, 552 [169 Cal.Rptr. 391].) The fact that the Legislature has elected to create a separate commission to improve public transportation does not change the functional nature of the public service being rendered. Nor does the legislative action either permit or require us to ignore the obvious replacement role which LACTC's sales tax can, and doubtless will, play as a substitute for a real property tax.

What the majority opinion really tells us is that the constitutional restrictions of article XIII A, section 4, can be readily and completely avoided by the simple creation of a district which is geographically precisely coterminous with a county, but which lacks its real property taxing power. In this connection, I believe the majority is exceedingly naive when it insists that the Legislature will not be importuned successfully by other local entities to grant to them similarly easy escapes from the fiscal constraints of article XIII A. (*Ante*, p. 208.) I think such appeals are not only probable, but certain, and in large numbers. The majority has cut a hole in the financial fence which the people in their Constitution have erected around their government. Governmental entities may be expected, instinctively, to pour through the opening seeking the creation of similar revenue-generating entities in myriad forms which will be limited only by their ingenuity. "We are not to 'shut our minds' as judges to truths that 'all others can see and understand.'" (*McGovern* v. *City of New York* (1923) 234 N.Y. 377, 392 [138 N.E. 26, 25 A.L.R. 1442].)

Further, the majority's conclusion that LACTC is not a "special district" subject to the limitations of section 4 is also expressly contradicted by enabling legislation which was enacted for the specific purpose of implementing article XIII A. (See Gov. Code, §§ 50075, 50077.) Such "contemporaneous construction of the Legislature" may, of course, be helpful in resolving apparent ambiguities in constitutional language. (See *Amador, supra*, 22 Cal.3d at p. 245.) The statutory language is controlling on the point. In an obvious attempt to comply with the constitutional directive of this amendment, the Legislature provided for the adoption of "special taxes" by "any city, county, or district" upon the approval of two-thirds of those voting on such proposal. (Gov. Code, § 50077, subd. (a).) The Legislature further defined the word "district" to mean "an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries." (*Id.*, § 50077, subd. (c).) LACTC fits this definition exactly. While the statutory language omits

the adjective "special," the unmistakably articulated legislative purpose of the statute to give effect to the constitutional mandate (see *id.*, § 50075) clearly indicates to me that the definition provided conforms to the Legislature's view, at least, of the constitutional command. Significantly, the majority does not disagree. (See *ante*, p. 207.)

Equally important to a conclusion that LACTC is a "special district" within the purview of section 4 is the apparent comprehensive nature of the taxing limitation imposed by article XIII A. The two-thirds voter approval requirement has been constitutionally ordained not only for tax increases instituted by *counties, cities* and *special districts* (§ 4), but also for tax increases implemented by the *state* Legislature itself (§ 3). To recognize an otherwise undefined *residual* category of local governmental agencies, "nonspecial districts" as it were, which are free to impose new or increased taxes without the two-thirds voter approval requirement is anomalous at best. At worst, such a construction would create a loophole which would be fatal to the rule itself, thereby permitting the most flagrant flouting of the people's will by the creation of multiple "nonspecial districts" which could levy taxes willy nilly without restraint, oblivious to the constitutional command and subversive of its clear objectives.

As with the Legislature and the majority (*ante*, p. 207), I fully acknowledge the affirmative feature of section 4 which confers upon "districts" a right to levy taxes by a two-thirds vote. Unlike the majority, however, I also accept the Legislature's foregoing definition of such districts and do not understand how, in reason, the definition describing those districts as state agencies formed for "the local performance of governmental or proprietary functions" can be read to exclude LACTC. Indeed, being neither county nor city, if LACTC is not a "special district" within the meaning of section 4, I must ask my colleagues: Where is its constitutional authority to levy any taxes at all?

Although the majority opinion does not reach the issue, my conclusion that LACTC is a "special district" within the meaning of section 4 requires a determination whether the sales tax in question is a "special tax" to which the two-thirds majority vote requirement is applicable.

I return to the overall objective of article XIII A described by the framers as assuring "effective real property tax relief" and their attempt to achieve that objective by prohibiting local imposition of substitute taxes unless approved by two-thirds of the electorate which is to be

taxed. (See *Amador, supra*, 22 Cal.3d at p. 231; see also *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 983 [156 Cal.Rptr. 777] ["Section 4 of [art. XIII A] is aimed at limiting local governments' ability to replace funds reduced by other sections of the article by shifting to other types of taxes."].)

There is a direct relationship between the objective of article XIII A and the definition of "special taxes," the adoption of which is limited by section 4. Without disavowing our identification of that objective in *Amador*—and the majority does not suggest such disavowal—it is apparent that the broadest possible definition of "special taxes" would best serve that objective of tax relief. But it is not necessary within the context of this case to probe the definitional limits of "special taxes." It is patently obvious that the constitutional phrase *must* encompass the tax adopted by LACTC. The purpose of the tax in question is to generate within the geographical boundaries of Los Angeles County revenues for the improvement of public transit within that locale. Such a tax is a substitute for those revenues which could otherwise have been generated by real property taxes imposed by Los Angeles County itself *but for* the restrictions of article XIII A. To be consistent with the constitutional limitation which concededly would bar the *county* from imposing the new tax on its citizens without the approval of two-thirds of the county's voters, we should similarly bar the county's *surrogate*, LACTC, from accomplishing the same objective without the constitutionally requisite approval.

The foregoing interpretation of the constitutional language seems to me equally supported by the analysis of article XIII A which was offered to the voters by the Legislative Analyst at the time the constitutional amendment was adopted. (We have heretofore approved recourse to such materials for the purpose of determining the "probable meaning of uncertain language" contained in such measures. (*Amador, supra*, 22 Cal.3d 208, 246; see *Lonergan, supra*, 27 Cal.3d 855, 866; *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 580-581 [203 P.2d 758]; *Carter* v. *Com. on Qualifications, etc.* (1939) 14 Cal.2d 179, 185 [93 P.2d 140].)

With regard to section 4, the voters were told that although "The initiative permits local governments to raise additional revenues ... [, n]ew taxes would also have to be approved by two-thirds of the local voters. Thus the initiative would restrict the ability of local governments to impose new taxes in order to replace the property tax revenue losses."

(Ballot Pamp., Primary Elec. (June 6, 1978) p. 60.) Further, the proponents of the initiative specifically summarized its intended effects as follows: "Limits property tax to 1% of market value, requires two-thirds vote of both houses of the legislature to raise any other taxes, limits yearly market value tax raises to 2% per year, and *requires all other tax raises to be approved by the people.*" (*Id.*, at p. 58, italics added.) Notably, none of the various arguments for or against adoption of the initiative denied that such would be the effect of its passage.

Arguably, the analysis need not be pressed further than to conclude that LACTC's sales tax is included within the "special tax" category of section 4. LACTC's argument to the contrary, however, involves a consideration of alternative definitions of the constitutional phrase.

It is noteworthy that heretofore the term "special taxes" has not acquired an established meaning, but has received a variety of interpretations within different contexts. No case has attempted a comprehensive definition of the term as used in section 4. (See *Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 323 [170 Cal.Rptr. 685].)

In *County of Fresno* v. *Malmstrom, supra,* 94 Cal.App.3d 974, for example, the court opined: "A 'special tax' is a tax collected and earmarked for a special purpose, rather than being deposited in a general fund. [Citations]" (P. 983.) The LACTC tax before us obviously *would* be included within such a formulation, and so barred because lacking the two-thirds voter approval mandated by section 4. However, it does not appear that the *Malmstrom* court intended to provide a comprehensive meaning of the term "special taxes." Rather, that court sought only to distinguish the "special assessment" before it from a "special tax," whatever the latter might be. (*Id.*, at p. 984; see *Trent Meredith, Inc., supra,* 114 Cal.App.3d at p. 323.) More significantly, the ease with which the constitutional restriction on *such* a "special tax" could be evaded by simply depositing the revenues generated therefrom into a general fund, and making the fund subject to the implementation of the specific purpose which motivated the tax, would render the adoption of such a definition inappropriate to implement the broader purpose of "effective" tax relief.

Similarly, there is no basis for concluding that section 4's two-thirds voter approval requirement for "special taxes" was meant to be limited to: (1) "real property taxes," most, if not all, of which would appear to

be barred expressly by section 4 (but see *Trent Meredith, Inc., supra*, 114 Cal.App.3d at pp. 325, 328); (2) "special assessments" or regulatory fees, which are exacted in reasonable proportion to the cost of a specific governmental service benefiting the payor, and are not taxes at all (see Gov. Code, § 50076; *Solvang Mun. Improvement Dist. v. Board of Supervisors, supra*, 112 Cal.App.3d at pp. 552-553; *Mills, supra*, 108 Cal.App.3d at pp. 659, 663; *Malmstrom, supra*, 94 Cal.App.3d at p. 984; *City of Saratoga v. Huff* (1972) 24 Cal.App.3d 978, 986-987 [101 Cal.Rptr. 32, 102 Cal.Rptr. 376]); (3) taxes imposed on specific entities or activities (see *City of Oceanside v. Pacific Tel. & Tel. Co.* (1955) 134 Cal.App.2d 361, 370 [285 P.2d 704]); or (4) taxes imposed upon taxpayers which are exempt from "ordinary" taxes (see *County of Ventura v. Channel Islands State Bank* (1967) 251 Cal.App.2d 240, 246 [59 Cal.Rptr. 404]). There is no suggestion in the language or history of article XIII A that adoption of any of these specific and limited meanings of the term "special taxes" was contemplated by the framers of the provision or the voters who adopted it. Nor, in my view, would the far-reaching purposes of article XIII A be served by construing that term in so restrictive a fashion.

Also, there is an overriding reason for interpreting the term "special taxes" in a broad and comprehensive manner. As we stressed in *Amador*, the "super-majority" two-thirds vote requirement for "special taxes" is defensible largely as the *preserver* of home rule principles. (22 Cal.3d 208, 226-228.) Confining to a narrow category the taxes to which that requirement is applicable would seriously undermine those principles.

Although I do not consider it necessary to so conclude for the purposes of this action, it is arguable under the taxing scheme embodied in article XIII A, that "special taxes" are now the *only* new or increased taxes which cities, counties and special districts are empowered to impose to replace lost real property tax revenues. There is no provision for the adoption of other, "nonspecial" taxes by a lesser majority; and we cannot assume that the drafters or adopters of the amendment sought to emasculate local government by not only requiring approval of any such "replacement" taxes by a two-thirds majority of the electorate, but also restricting the nature of such permissible taxes to some undefined, narrow category. In short, I do not view it as necessary to the effectuation of the constitutional amendment here under review, and more particularly of section 4 thereof, to give to the undefined term "special taxes" a meaning so restrictive as to undercut the very premise of that

amendment—namely, that any revenues over and above the 1 percent real property ad valorem tax authorized by section 1 could be generated under section 4 by local government's imposition of such new or increased taxes as two-thirds of the electorate to be affected would agree were necessary or desirable.

LACTC argues, however, that a broad definition of the term "special taxes" would ignore the ordinary meaning of the word "special," as pertaining to the "unusual" or "extraordinary," contrary to an established rule of construction. (See *Fields* v. *Eu* (1976) 18 Cal.3d 322, 327 [134 Cal.Rptr. 367, 556 P.2d 729].) Yet, it is apparent that this word has a number of "ordinary" meanings, not only the one designated by LACTC; and among these are "extra" and "additional." Under such circumstance an equally well settled rule would appear to be of greater assistance to our interpretive efforts. "It is a cardinal rule of construction that words or phrases are not to be viewed in isolation; instead, each is to be read in the context of the other provisions of the Constitution bearing on the same subject. [Citation.] The goal, of course, is to harmonize all related provisions if it is reasonably possible to do so without distorting their apparent meaning, and in so doing to give effect to the scheme as a whole. [Citations.] Strained interpretation, or construction leading to unreasonable or impractical results, is to be avoided. [Citations.]" (*Id., supra*, at p. 328.)

In my view, the most natural "ordinary" meaning of the term "special taxes" within the context of article XIII A includes the kind of substitutional or replacement tax adopted by LACTC which serves to offset the reduction of real property taxes enforced by sections 1 and 2 of the amendment. Whatever the ultimate reach of the constitutional prohibition, it would seem clear that the other literal meanings given to the phrase "special taxes" in other specific contexts which we have discussed should be rejected here "to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]" (*Amador, supra*, 22 Cal.3d at p. 245.)

I do not read article XIII A as contemplating the existence of any vestigial species of "nonspecial taxes" which local government may impose to counteract the tax savings intended by the framers of the amendment without the approval of two-thirds of the electorate affected. Neither can I identify within the amendment a purpose to create a privileged class of "nonspecial districts" which remain unrestricted thereby. In my opinion, the recognition and preservation of such cate-

gories cannot reasonably be reconciled with the "underlying purpose and chief aim" of article XIII A of the Constitution, to wit, "effective real property tax relief." (See *Lonergan, supra*, 27 Cal.3d 855, 863; *Amador, supra*, 22 Cal.3d 208, 218, 220, 224, 230, 231, 243.)

Focusing not upon LACTC's characterization of itself or of its tax, but rather upon the function of government which it proposes to accomplish with the revenues from that tax, I conclude that LACTC's sales tax is constitutionally deficient. It is a "special tax" imposed by a "special district." Because it was not approved by "two-thirds vote of the qualified electors of such district...," it violated article XIII A, section 4 of the California Constitution.