64 Cal.App.4th 662 (1998)
ROBERT F. COLEMAN et al., Plaintiffs and Appellants,
v.
COUNTY OF SANTA CLARA, Defendant and Respondent. SANTA CLARA COUNTY TAXPAYER'S ASSOCIATION, Plaintiff and Appellant,
v.
COUNTY OF SANTA CLARA, Defendant and Respondent. LIBERTARIAN PARTY OF SANTA CLARA COUNTY, Plaintiff and Appellant,
v.
COUNTY OF SANTA CLARA, Defendant and Respondent.
Docket No. H016980.
Court of Appeals of California, Sixth District.
June 8, 1998.
*663 COUNSEL
Robert W. Rychlik for Plaintiffs and Appellants.
*664 Steven M. Woodside, County Counsel, William I. Anderson, Chief Deputy County Counsel, Linda A. Deacon, Deputy County Counsel, Orrick, Herrington & Sutcliffe, John H. Kanberg, Mary A. Collins and Malcolm Carson for Defendant and Respondent.
Joan R. Gallo, City Attorney (San Jose), George Rios, Assistant City Attorney, and Glenn Schwarzbach, Deputy City Attorney, as Amici Curiae on behalf of Defendant and Respondent.
OPINION
WUNDERLICH, J. 

I. Introduction

In this case, we uphold the validity of a sales tax increase (Measure B tax) approved by a simple majority of the voters (51.8 percent) in the 1996 General Election in Santa Clara County. We conclude that Measure B is a "general" tax and thus not subject to supermajority voter approval requirements applicable to "special" taxes under article XIII A, section 4, of the California Constitution[1] (Section 4), popularly known as Proposition 13, and its statutory counterpart Government Code section 53722[2] (Section 53722), popularly known as Proposition 62.

II. Statement of the Case

In three consolidated actions against the County of Santa Clara (County), Robert F. Coleman, Robert G. Wilson, Jr., and Charles S. Moore, the Libertarian Party of Santa Clara County, and the Santa Clara County Taxpayer's Association (collectively referred to as appellants) sought to invalidate the Measure B tax. (See Code Civ. Proc., §§ 863, 865.)
This appeal is from a judgment entered after the trial court granted the County's motion for summary judgment. Appellants contend the court erred *665 in finding that the Measure B tax was a "general tax" without regard to whether Measure B was designed to circumvent the supermajority requirements of Section 4 and Section 53722. Appellants also contend that the court erred in denying additional discovery to develop evidence that might reflect the county's intent to circumvent Section 4 and Section 53722.
We affirm the judgment.

III. Background

A. Ballot Measures A and B

The Santa Clara County Sample Ballot & Voter Information Pamphlet (Pamphlet) for the November 1996 General Election published the text of Measures A and B. It also provided "impartial analysis" by the county counsel and arguments for and against both measures. We briefly summarize information in the Pamphlet.

1. Measure A.[3]
Measure A provides, in relevant part, "This measure is NOT a tax. It is an advisory measure that states Santa Clara County voters' intent that any new sales tax funds be spent on [a list of] transportation improvements"; that administrative expenses be limited to "0.5 percent of the funds"; and that all "projects be implemented within nine years."[4] (Pamphlet, supra, at pp. 020-021, italics in original.)
In his analysis, the county counsel reiterated that the measure was advisory only. He explained that an advisory measure is not "`controlling on the sponsoring legislative body.'" (Pamphlet, supra, at p. 020, quoting Elec. Code, § 9603, subd. (c).) In other words, "The opinion expressed through the vote on this advisory measure, while of interest to the County Board of Supervisors, is not in any manner legally controlling on the Board of Supervisor's [sic] use of the proceeds of any sales tax." (Pamphlet, supra, at p. 020.)
Proponents of Measure A claimed that it "addresses the top transportation priorities" in the County and represents a "balanced, sensible solution" to *666 gridlock and highway safety problems. (Pamphlet, supra, at pp. 024, 026, italics in original.) They emphasized that it was not a tax but rather an expression of "how we, as Santa Clara County voters and taxpayers, [wanted] any new sales tax dollars  our money ... spent." (Pamphlet, supra, at p. 024.)
Opponents, including appellants, claimed that Measures A and B "do not guarantee additional money will go to transportation projects. In fact, revenues generated from this `transit' tax may go to other budget areas not even related to transportation!" (Pamphlet, supra, at p. 025.) They alleged that the two measures were on the ballot because their backers' "earlier attempt to circumvent state law for roads and transit was invalidated by the California State Supreme Court." (Ibid.)[5] According to opponents, Measures A and B were a new "scheme," which would end up in court again. (Pamphlet, supra, at p. 025.)

2. Measure B.

Measure B provides, in relevant part, "This measure authorizes the enactment of a 1/2 cent retail transaction and use (sales) tax for general county purposes...." (Pamphlet, supra, at p. 028.) It further requires the tax to expire in nine years and creates the "Independent Citizens Watchdog Committee," which must regularly publish reports on how the sales tax revenues are being spent. (Ibid.)
The county counsel opined that Measure B was a "general tax" because it "is to be used `for general County purposes.' This means that the tax proceeds may be used by the County for any legal governmental purpose without restriction. The County is not in any way legally bound to use the tax monies for any special purpose or for any particular project or projects." (Pamphlet, supra, at p. 026.) Counsel further explained that the additional provisions concerning the expiration period and watchdog committee "do not in any way legally restrict the scope of the County's right to use the tax proceeds for `general County purposes.'" (Ibid.)
Proponents of the measure argued that it "will make it possible to reduce traffic by fixing and widening major roadways and providing options like linking Santa Clara County to BART." (Pamphlet, supra, at p. 029, italics in *667 original.) They further asserted that "Measure B will provide funds that can be used for general county purposes. BUT IF MEASURE A ALSO PASSES, voters will indicate that we want these funds used to accomplish [various public transportation projects]." (Pamphlet, supra, at p. 029.)
Opponents argued that Measure B was simply a tax and that the watchdog committee was "toothless." (Pamphlet, supra, at p. 030.) Noting that other counties had transferred transit funds into their general funds, opponents charged that "[m]oney re-allocation would be even easier with Measure B! The tax funds would be placed in the County general fund to begin with." They claimed, moreover, that "[t]here is no assurance this tax would be spent where you would like it to go. It is just a huge blank check!" (Pamphlet, supra, at p. 031.)

B. The Litigation

In their complaints, appellants alleged that Measures A and B were designed to circumvent supermajority voter approval requirements. They further alleged that because the measures were inseparably linked, Measure B became a "special tax." Thus, because it was not approved by a supermajority, the tax was invalid under Section 4 and Section 53722. Appellants also alleged that by presenting both measures, the County breached its duty to maintain a clear line of demarcation between "general" and "special" taxes.
The County answered and moved for summary judgment. It claimed the undisputed facts concerning the nature and substance of Measures A and B established as a matter of law that the Measure B tax was a valid "general" tax.
In opposition, appellants claimed there were triable issues of fact concerning the County's intent and effort to circumvent the supermajority requirements and the County's effort to blur the difference between "general" and "special" taxes. They also sought additional discovery to find evidence relevant to these issues.
At oral argument below, appellants conceded that without Measure A, Measure B appeared to be a valid "general" tax. They conceded that new tax revenue could be used for purposes other than transportation projects enumerated in Measure A. And they conceded that the mere presence of advisory and tax measures on the same ballot does not automatically render the tax measure a "special" tax. They argued, however, that the labels on Measures A and B  "advisory measure" and "general tax"  were not controlling. Rather, where, as alleged here, the advisory and tax measures are *668 inseparable, the tax measure becomes a "special" tax subject to supermajority requirements. They also argued that additional discovery would reveal that the County intended to enact a special purpose tax for transportation projects and it bifurcated the vote on the tax and its purpose to avoid the supermajority requirement.
The County argued the tax was a "general" tax because the revenue could be used without limitation for any governmental purpose. It also argued that the intent behind the two measures was irrelevant because it could not alter the meaning and scope of the tax. Therefore, further discovery concerning the County's purpose and intent was unnecessary.

C. The Trial Court's Ruling

The trial court found that Measure A was clear and unambiguous: It was advisory only and placed no legal restrictions on the use of Measure B tax revenues. The court similarly found Measure B clear and unambiguous: New tax revenues go into the general fund and are available for general governmental purposes. The court astutely observed that there could be adverse political fallout if County supervisors disregarded the advisory spending priorities in Measure A. Nevertheless, it concluded that the undisputed, unambiguous content of the measures established as a matter of law that Measure B tax was a "general" tax. Under these circumstances, the court found the underlying motives of those who proposed the measures irrelevant and granted the County's motion for summary judgment.

IV. Measure B Is a "General" Tax

In City and County of San Francisco v. Farrell (1982) 32 Cal.3d 47 [184 Cal. Rptr. 713, 648 P.2d 935] (Farrell), the court construed the term "special tax" as used in Section 4. At issue was a payroll and gross receipts tax that went into the general fund and was available for general purposes. In 1980, two years after Section 4 took effect, a simple majority of the voters approved an extension of the tax. Our Supreme Court construed the term "special taxes" to mean "taxes which are levied for a specific purpose rather than, as in the present case, a levy placed in the general fund to be utilized for general governmental purposes."[6] (32 Cal.3d at p. 57.) Since the tax proceeds went into the general fund, the court held that the tax was not subject to Section 4. (See, e.g., Cohn v. City of Oakland (1990) 223 Cal. App.3d 261 [272 Cal. Rptr. 714] [under Farrell, real estate transfer tax is "general" tax]; City of Oakland v. Digre (1988) 205 Cal. App.3d 99 [252 *669 Cal. Rptr. 99] [parcel tax a "general" tax]; Fenton v. City of Delano (1984) 162 Cal. App.3d 400 [208 Cal. Rptr. 486] [user fee not a "general" tax].)
Several years later, in Rider v. County of San Diego (1991) 1 Cal.4th 1 [2 Cal. Rptr.2d 490, 820 P.2d 1000] (Rider), the court affirmed but restricted the application of Farrell's definitions of "special" and "general" taxes. In Rider, the county created the San Diego County Regional Justice Facility Financing Agency. The agency adopted and later a simple majority of the voters approved a tax that went into the agency's general fund to finance construction and operation of various judicial facilities. A majority of our Supreme Court concluded that although the tax revenues went into the agency's general fund, the tax was a "special tax" subject to Section 4. The majority stated that a "special tax" is one "levied to fund a specific governmental project or program, such as the construction and financing of the County's justice facilities." (1 Cal.4th at p. 15.) Thus, any tax imposed by a special, limited purpose agency was, by definition, a special tax, in that it was earmarked for specific, rather than general, governmental purposes. (Ibid.; see, e.g., Santa Clara County Local Transportation Authority v. Guardino, supra, 11 Cal.4th 220 [tax by special agency is a special tax]; Hoogasian Flowers, Inc. v. State Bd. of Equalization (1994) 23 Cal. App.4th 1264 [28 Cal. Rptr.2d 686] [same]; Monterey Peninsula Taxpayers Assn. v. County of Monterey (1992) 8 Cal. App.4th 1520 [11 Cal. Rptr.2d 188] [same].)
The issue of whether a tax was "special" or "general" arose again in Neecke v. City of Mill Valley (1995) 39 Cal. App.4th 946 [46 Cal. Rptr.2d 266] (Neecke) (review den. Jan. 4, 1996). There, the city adopted an ordinance reimposing a "municipal services tax" that would be collected by the county and placed "`into the general fund of [the city] and may be used for any and all municipal purposes.'" The tax was approved by a simple majority of the voters. (Id. at pp. 950-951.) The court concluded that under the Farrell definition, the tax was a "general" tax. (Id. at p. 959.)
(1) The appellant in Neecke, claimed, as do appellants in this case, that Rider overruled Farrell and made the intended use of the tax determinative of its nature as "special" or "general." The Neecke court disagreed, finding that although Farrell was restricted by Rider, Farrell still controlled taxes that are imposed by a "general purpose entity," such as a city, and placed in that entity's general fund for general governmental purposes. (39 Cal. App.4th at pp. 956-958.) The court pointed out that our Supreme Court recently cited Farrell and did not suggest that it had been disapproved or that its definitions were no longer valid or controlling. (Id. at p. 956, fn. 5.)
We agree with the analysis and conclusion in Neecke. Here, the Measure B sales tax is indistinguishable from the tax in Neecke. Both are imposed by *670 general governmental entities  a city, a county; and the revenue from both taxes goes into a general fund and is available for general governmental purposes. Thus, under Farrell, the trial court properly concluded that the Measure B tax is a "general" tax. (See Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455 [20 Cal. Rptr. 321, 369 P.2d 937].)
Appellants claim the Measure B tax is not a "general" tax because the Pamphlet did not expressly describe it as such but merely said that revenue was available "for general county purposes." They argue that expenditures for some "county purposes" may not necessarily be for "general governmental purposes." This claim is meritless.
Appellants do not explain the alleged distinction between general "county" purposes and general "government" purposes or suggest how the County might spend the money for a county purpose that was not also a "general governmental purpose." As noted, there is no material distinction between the Measure B tax and the tax upheld in Neecke, which was available "for any and all municipal purposes." (Neecke, supra, 39 Cal. App.4th at p. 950, italics added.) Moreover, the arguments in the Pamphlet and the analyses by county counsel made it unmistakably clear that Measure B tax revenue would go into the general fund and be available for any county purpose without legal restriction. Indeed, the availability of new tax revenue for any purpose was one of the arguments raised against Measure B.[7]
Appellants claim that because Measure A was so inseparable from Measure B the two in effect became a single proposal for a "special" tax and, therefore, subject to supermajority requirements. We disagree.
Obviously, the two ballot measures were closely related to each other: One increased the sales tax; the other expressed the voters' preference for how new tax revenue should be spent. This relationship, however, does not reflect such inseparability that as a matter of law the two measures must be considered as one. On the contrary, the measures were not legally connected. The spending priorities in Measure A were not compulsory. The County was free to spend Measure B revenue on any and all County purposes without restriction. And the validity of neither measure was dependent on passage of the other.
*671 Furthermore, the text of the measures, the county counsel's analyses, and the Pamphlet arguments made it clear that the two measures were legally separate and distinct. The fact that Measure A was approved by 77.6 percent of the voters but Measure B by only 51.8 percent indicates the voters understood the two measures were separate. Under the circumstances, therefore, we see no factual or legal basis to hold that the presence on the ballot of Measure A next to Measure B rendered Measure B subject to supermajority requirements.
Appellants claim the trial court erred in failing to permit inquiry into the circumstances surrounding the passage of Measures A and B. Their underlying claim is that the tax should be deemed invalid if the County bifurcated the vote on the tax (Measure B) and its intended purposes (Measure A) to evade or circumvent the supermajority requirements. In support of their claims appellants rely primarily on Rider.
The court in Rider was concerned about whether the county acted for the purpose of circumventing the supermajority requirements. However, the main issue there was not whether the tax was "special" or "general" but whether a new agency was a "special district" within the meaning of Section 4. (See fn. 1, ante, p. 664.) In claiming the agency was not a "special district," the county relied on Los Angeles County Transportation Com. v. Richmond (1982) 31 Cal.3d 197 [182 Cal. Rptr. 324, 643 P.2d 941] (Richmond). In Richmond, the court held that an agency lacking the power to impose property taxes is not a "special district." (Id. at pp. 205-206.)
In Rider, the majority belatedly acknowledged that Richmond had created an unwarranted loophole in Section 4.[8] Under Richmond, a county could avoid the supermajority requirement by creating an agency dedicated to specific governmental purpose but which lacked the property tax power. Since the agency was not a "special district," it could enact the "special tax" with simple majority approval. To prevent such easy circumvention of Section 4, the Rider court rejected the Richmond definition of "special *672 district" and declared that the term includes "any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13." (Rider, supra, 1 Cal.4th at p. 11.)
Rider does not help appellants here. As the Neecke court pointed out, nothing in Rider suggests that tax revenue placed in a county's general fund and available for general county purposes is, or could be deemed, a "special" tax. (Neecke, supra, 39 Cal. App.4th at pp. 956-958.)
The Neecke court found it unnecessary to consider the purposes behind enacting a tax that was destined for a general fund and available for general governmental purposes. (Neecke, supra, 39 Cal. App.4th at p. 958.) The court pointed out that in Farrell and later cases, the courts were aware but not concerned that governmental entities might try to replace reduced property tax revenues by enacting "general fund" taxes like those in Farrell, Neecke, and other cases. (Ibid.; see Farrell, supra, 32 Cal.3d at pp. 56-57 [maj. opn.], 57-58 (dis. opn. of Richardson, J.); Fenton v. City of Delano, supra, 162 Cal. App.3d at p. 408.)
The Neecke court also opined that for courts to consider a government's motivation for enacting a "general fund" tax would violate the rule that except in "`rare circumstances,'" courts must determine the validity of legislation by its own terms and not the motives of, or influences upon, the legislators who enacted it. The court concluded that although the Rider court apparently found that the potential threat to Proposition 13 posed by the newly created "special districts" constituted a "rare circumstance" in which the general rule should be avoided, the circumstances in Neecke did not justify a "rare exception" to the general rule. (Neecke, supra, 39 Cal. App.4th at pp. 958-959.)
Neecke's analysis is persuasive, and we adopt it here. The Farrell definition of a "general" tax does not create a potential loophole similar to that created by the Richmond definition of "special district" and thus does not warrant judicial concern for the motivation behind a "general fund" tax. Indeed, it seems irrational to subject two identical "general fund" tax measures to different voter approval requirements because, in proposing them, elected city or county officials had specific projects in mind for one but not the other.
We readily acknowledge that as a result of our decision, ballot bifurcation makes it possible for cities and counties to raise new tax revenue by simple majority and then spend it on a specific list of projects. However, we do not believe that such bifurcation, like the creation of new districts discussed in *673 Rider, represents a means to circumvent supermajority requirements. This is so because Propositions 13 and 62 were not intended to make it more difficult to raise all new taxes, only those that are legally earmarked for specific purposes.

V. Conclusion and Disposition

Given our analysis, we conclude that the trial court correctly determined that there were no triable issues of fact concerning the validity of the Measure B sales tax and properly granted the County's motion for summary judgment.
The judgment is affirmed.
Premo, Acting P.J., and Elia, J., concurred.
The petition of appellants Robert F. Coleman et al. for review by the Supreme Court was denied August 26, 1998. Brown, J., was of the opinion that the petition should be granted.
NOTES
[1] Article XIII A, section 4, provides, in pertinent part, "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Italics added.)
[2] Government Code section 53721 provides that "All taxes are either special taxes or general taxes. General taxes are taxes imposed for general governmental purposes. Special taxes are taxes imposed for specific purposes."

Section 53722 provides, "No local government or district may impose any special tax unless and until such special tax is submitted to the electorate of the local government, or district and approved by a two-thirds vote of the voters voting in an election on the issue." (Italics added.)
[3] Measure A was approved by 77.6 percent of the voters.
[4] Measure A listed the following improvements: fixing streets and potholes; linking to BART (Bay Area Rapid Transit); synchronizing all expressways; building Tasman, Capital and Vasona Light Rail; widening Highways 880, 101, 87, 17; increasing Caltrain service; upgrading Highways 237/880, 85/101, 85/87 interchanges; improving safety: Pacheco Pass, Highway 85; expand bicycle routes; and improving senior and disabled transit service.
[5] This statement refers to an identical half-cent sales tax dedicated to specific transportation projects that was adopted by the Santa Clara Local Transportation Authority in 1992 and thereafter approved by a simple majority of the voters. However, the tax was later invalidated by our Supreme Court in Santa Clara County Local Transportation Authority v. Guardino (1995) 11 Cal.4th 220 [45 Cal. Rptr.2d 207, 902 P.2d 225]. The court concluded that it was a special tax and therefore subject to the supermajority requirement.
[6] In defining "special" and "general" taxes in the Government Code, the Legislature mirrored the language used in Farrell. (See fn. 2, ante, p. 664.)
[7] Given the indisputable clarity of the two measures concerning the availability of funds for any purpose and not just those listed in Measure A, the trial court properly rejected appellants' claim that the County breached its duty to maintain a clear line of demarcation between "special" and "general" taxes. Moreover, we question whether a legal duty to clearly demarcate exists and more seriously doubt the existence of a postelection cause of action to invalidate a tax based on an alleged breach of this "duty."
[8] In his dissent in Richmond, Justice Richardson predicted that the majority's analysis could be used to circumvent the supermajority vote requirement "by the simple creation of a district which is geographically precisely coterminous with a county, but which lacks its real property taxing power.... The majority has cut a hole in the financial fence which the people in their Constitution have erected around their government. Governmental entities may be expected, instinctively, to pour through the opening seeking the creation of similar revenue-generating entities in myriad forms which will be limited only by their ingenuity." (Richmond, supra, 31 Cal.3d at p. 213 (dis. opn. by Richardson, J.).)

In Rider, the majority observed, "The fact that, following Richmond, supra, 31 Cal.3d 197, numerous `special purpose' districts were created ... strongly indicates a large `hole' has indeed been created in Proposition 13, confirming Justice Richardson's prediction." (Rider, supra, 1 Cal.4th at p. 11.)