Filed 11/26/25

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| HOWARD JARVIS TAXPAYERS ASSOCIATION,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>COACHELLA VALLEY WATER DISTRICT,<br><br>     Defendant and Appellant. | E081996<br><br>(Super.Ct.No. RIC1905897)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Sunshine S. Sykes and Craig Riemer, Judges.  Affirmed.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Pamela K. Graham, and Liliane M. Wyckoff for Defendant and Appellant.

Hanson Bridgett, Claire H. Collins, Sean G. Herman, and Julian A. Viksman for The League of California Cities et al., as Amicus Curiae on behalf of Defendant and Appellant.

1

Costell & Adelson Law Corporation and Jeffrey Lee Costell; Frost, Joshua S. Stambaugh, John M. Haytol, Paruyr (Paul) Ghazaryan, and Sara McDuffie for Plaintiff and Appellant.

In this consolidated appeal, defendant and appellant Coachella Valley Water District (the Water District) appeals from trial court rulings finding its groundwater replenishment charges unconstitutional and awarding plaintiff and respondent Howard Jarvis Taxpayers Association (Howard Jarvis) refunds on behalf of the Water District's domestic customers. Howard Jarvis cross-appeals, arguing that the trial court erred in finding that the validation statutes (Code Civ. Proc., §§ 860-870.5) apply to the replenishment charges and dismissing its lawsuit challenging those charges for years other than the ones it successfully challenged. We affirm in full.

## I. BACKGROUND

"Howard Jarvis and the Water District have litigated repeatedly," and this is the fifth appeal we have recently heard involving these parties or their principals. (*Howard Jarvis Taxpayers Assn. v. Powell* (2024) 105 Cal.App.5th 955, 960.) In *Coachella Valley Water District v. Superior Court of Riverside County* (2021) 61 Cal.App.5th 755 (*Coachella I*), we held that the validation statutes applied to the Water District's ad valorem property tax. In *Howard Jarvis Taxpayers Association v. Coachella Valley Water District* (Feb. 10, 2023, E078411) [nonpub. opn.] (*Coachella II*), we held that the Water District's interfund loan did not violate Propositions 218 (as approved by voters, Gen. Elec. (Nov. 5, 1996)) or 26 (as approved by voters, Gen. Elec. (Nov. 2, 2010)). In

2

*Howard Jarvis Taxpayers Assn. v. Powell*, *supra*, 105 Cal.App.5th 955 (*Coachella III*), an appeal which did not specifically involve the Water District itself, we held that the public interest exemption did not apply to an anti-SLAPP motion brought by the Water District's board of directors, general manager, and consultants. And in *Howard Jarvis Taxpayers Assn. v. Coachella Valley Water District* (2025) 108 Cal.App.5th 485 (*Coachella IV*), we held both that the Water District's Coachella Canal water charges violated article XIII C of the California Constitution and that refunds of those charges were constitutionally required.

This latest appeal involves challenges against the Water District's groundwater replenishment charges.[1] "The Water District provides potable (drinkable) water to its domestic customers, and the area's main source of such water is groundwater. However, because groundwater is a limited resource in a desert region, groundwater conservation and replenishment are necessary." (*Coachella IV*, *supra*, 108 Cal.App.5th at p. 497.) Thus, the Water District has "the power to levy and collect water replenishment assessments . . . for the purpose of replenishing ground water supplies within the district." (Wat. Code, § 31630; see also *id.* at § 31632.5 ["Before July 1 of each year, the board may by resolution levy a replenishment assessment upon all water production during the following fiscal year within each area of benefit as determined by the board. The

---

[1] The parties call the charges Replenishment Assessment Charges, or RACs, and the relevant statutes use the term replenishment assessment. Throughout our opinion, we will usually use the term replenishment charges.

assessment within each area of benefit shall be at a uniform rate per acre-foot."].) The Water District imposes three such replenishment charges, one for customers in each of the Water District's three areas of benefit (AOBs) who pump more than 25 acre-feet of water from the aquifer in any year.

Those who buy drinking water from the Water District, which the Water District calls domestic customers, do not see a line item for replenishment charges in their bills, but they pay the replenishment charges indirectly. The money they pay for drinking water goes to the Water District's domestic water enterprise fund. "An enterprise fund is 'a budgetary device "used to track monies received and expended for municipal services where fees or charges to the users of those services pay wholly or in part for such services."'" (*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 5-6 (*Citizens for Fair REU Rates*).) Along with having an enterprise fund for domestic water . . . , the Water District has enterprise funds for sanitation (or sewer) service, flood control, and groundwater replenishment. . . . [T]he domestic water fund pays—and thus domestic customers pay—replenishment fees to three groundwater replenishment funds, one for each of the areas of benefit." (*Coachella IV*, *supra*, 108 Cal.App.5th at p. 497.)

Here, Howard Jarvis challenged the replenishment charges the Water District levied in four lawsuits, all of which have been consolidated into a single action. The first challenge, which contained a petition for writ of mandate and did not include a reverse validation complaint, was dismissed by the trial court on the ground that the validation statutes applied and the statute of limitations imposed by the validation statutes had

4

passed. The later three challenges were brought as reverse validation actions (or combined reverse validation and petitions for writ of mandate) and were resolved on the merits in Howard Jarvis's favor. For simplicity, we will refer to the first challenge as the "mandate" action and the other three challenges as the "reverse validation" actions, even though two of the reverse validation actions also contained petitions for writ of mandate, and even though the mandate action contained a complaint alleging other causes of action. Before us is the Water District's appeal from the reverse validation actions as well as Howard Jarvis's cross-appeal from the dismissal of the mandate action.

A. *The Mandate Action*

The mandate action we describe here is the same that was at issue in *Coachella III*. In *Coachella III*, we determined that most of Howard Jarvis's cross-appeal from the Water District's board of directors, general manager, and consultants' successful demurrer against defendants other than the Water District was moot, so we did not reach the merits. (*Coachella III*, *supra*, 105 Cal.App.5th at pp. 972-973.) Here, Howard Jarvis challenges the same demurrer on the same grounds, this time against the Water District, so we borrow from our opinion in *Coachella III* to describe this portion of the procedural history.[2]

After the Water District denied his government claim in May 2019, Randall Roberts filed a combined petition and putative class action complaint against the Water

---

[2] On our own motion, we take judicial notice of the appellate record in *Coachella III* and *Coachella IV*. (Evid. Code, §§ 452, subd. (d), 459.)

District and three of its directors, three of its consultants, and its general manager. "It alleged that the replenishment charges unconstitutionally violate Propositions 26 and 218, and that the defendants have 'perpetually forc[ed] property taxpayers, domestic ratepayers, and those paying [replenishment charges] in the West to subsidize the interests of large agricultural property owners in the East Coachella Valley, including Board members [defendants John] Powell [Jr.], [Peter] Nelson, and [Anthony] Bianco.' According to the pleading, in 2017, the replenishment charge for the East Whitewater River Basin [AOB] was $66 per acre-foot, whereas the replenishment charges for the West Whitewater River Subbasin [AOB] and Mission Creek Subbasin [AOB] were $143.80 per acre-foot and $135.53 per acre-foot, respectively. The pleading alleges that, as a result of the low replenishment charge for the East Whitewater River Basin area, 'Big Ag businesses in the East (including those owned by . . . Powell, Nelson and Bianco) enjoy artificially "cheap" groundwater and, in turn, reap incredible profits.' The low replenishment charge for that area was justified by the consultants' cost-of-service study, 'which deliberately fabricated a fictional basis for the discriminatory' rates." (*Coachella III*, *supra*, 105 Cal.App.5th at p. 961.)

The defendants demurred, but Roberts filed a first amended petition and complaint before the demurrer was decided. The defendants demurred again, and in June 2020, Judge Sykes sustained the demurrer on all causes of action, giving Roberts leave to amend on most (but not all) of the causes of action. The causes of action as to which Judge Sykes sustained the demurrer without leave to amend are not at issue here.

6

After Roberts filed a second amended petition and complaint, "[t]he defendants again demurred to all causes of action." (*Coachella III*, *supra*, 105 Cal.App.5th at p. 963.) "They argued, as earlier, that the replenishment charges were subject to the validation statutes, so, because Roberts did not timely sue in validation, the suit was time-barred as to any replenishment charge adopted more than 60 days before filing of the original petition and complaint. (See Code Civ. Proc., § 863.)[3] The defendants raised other grounds, but the trial court agreed the suit was time-barred and sustained the entire demurrer on that ground. The trial court stated orally that timeliness under the validation statutes was the reason the demurrer was sustained earlier, and without any new facts showing the suit to be timely, this time the entire demurrer was sustained without leave to amend." (*Ibid.*)

"No judgment was entered when the demurrer was sustained without leave to amend in December 2020. This was because in August 2020, Roberts had filed a [reverse] validation action challenging the replenishment charges the Water District approved for the 2021 fiscal year," which we describe below, and the trial court ordered the two cases consolidated. (*Coachella III*, *supra*, 105 Cal.App.5th at p. 963.) The trial court declined to sever the cases to enter judgment in the mandate action. (*Ibid.*)

"Several months later, Howard Jarvis substituted in as lead plaintiff for Roberts. The trial court allowed a third amended petition and complaint to be filed in [the mandate

---

[3] We describe the validation statutes in part II. B. 1. below.

7

action], per the parties' stipulation, solely to substitute Howard Jarvis for Roberts as the putative lead plaintiff. Plaintiff's counsel remained the same. The parties also stipulated that the demurrer to the second amended petition and complaint would be treated as the demurrer to the third amended petition and complaint and deemed sustained without leave to amend as explained in the trial court's earlier ruling." (*Coachella III*, *supra*, 105 Cal.App.5th at pp. 963-964.)

B. *The Reverse Validation Actions*

As mentioned, before Judge Sykes sustained the Water District's demurrer on the mandate action without leave to amend, Roberts had filed a (timely) reverse validation action challenging the replenishment charges for the 2021 fiscal year. The complaint did not contain other causes of action. The trial court ordered this reverse validation action consolidated with the mandate action, and Howard Jarvis later substituted in for Roberts as plaintiff.

Later, Howard Jarvis filed a combined petition and putative class action complaint challenging the replenishment charges for the 2022 fiscal year. The putative class was the Water District's domestic water customers who paid "a RAC Rate other than the East RAC Rate." The 2022 fiscal year reverse validation action was ordered consolidated with the mandate action. The parties then stipulated that "the remedies available to" Howard Jarvis in the consolidated action if it prevailed on the merits "shall include the relief available in traditional mandate actions, including but not limited to monetary relief in the form, as authorized by law, of a refund to taxpayers." This was despite the fact

8

that the validation action for the 2021 fiscal year did not contain a petition for writ of mandate. Howard Jarvis thus agreed that it would "not seek leave to amend the [2021 fiscal year reverse validation action] to include causes of actions alleging traditional writ of mandate, public waste, and/or declaratory relief at this time." The stipulation stated that the monetary relief would "be limited to Fiscal Years 2021 and 2022." The parties also agreed that, if Howard Jarvis prevailed on the merits "and complete relief is awarded to all affected ratepayers without class certification," Howard Jarvis would not seek class certification.

Howard Jarvis then filed another combined petition and putative class action complaint challenging the replenishment charges for the 2023 fiscal year. The parties stipulated that this reverse validation action would be consolidated with the mandate action and that the monetary relief Howard Jarvis could recover now included fiscal year 2023 as well.

Judge Sykes held that the replenishment charges were unconstitutional taxes. (See Cal. Const., art. XIII D, § 3, subd. (a) ["No tax, assessment, fee or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership except" as otherwise provided], art. XIII C, § 1, subd. (e)(2) [tax excludes a "charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product"].) She stated that the Water District, in its briefing and at the two-day hearing, did "not provide

9

any discussion about how the increased expenses unique to the West AOB result in the specific [RACs] those customers pay."[4] "All [the Water District had] done is show[] that there is some evidence to support the West RAC rates being higher than the East RAC rates," she continued, but that was "not the burden" the Water District had to meet. Furthermore, she concluded that the Water District did not "provide[] evidence to show that only the West AOB benefits from the higher costs associated with replenishing that area's groundwater," so it did not show "that the manner in which the RAC rates [were] allocated bears a fair or reasonable relationship to the burdens and benefits to the West and East AOB customers." Judge Sykes deferred ruling on remedies and instructed the parties to confer about a future hearing date for those issues.[5]

The parties disputed several damages issues. These included (1) whether the liabilities ruling invalidated the replenishment charges for all AOBs as opposed to just the West AOB; (2) the applicability of Health and Safety Code section 5472, which among other things requires that a person pay "under protest" before bringing an action (see *Coachella IV*, *supra*, 108 Cal.App.5th at pp. 514-516); (3) whether, assuming Howard Jarvis could otherwise recover damages, it could for fiscal year 2021, for which

---

[4] We discuss the geography of the Coachella Valley and the Water District's arguments for the constitutionality of the replenishment charges in part II. A. 2. a. below.

[5] The validation action for fiscal year 2023 had not been filed when Judge Sykes's issued her liability ruling, but the parties later stipulated that her ruling applied to the 2023 action as well.

no government claim had been submitted; (4) assuming recovery was possible, the appropriate amount of monetary relief; and (5) whether the Water District should be enjoined from charging or collecting unconstitutional replenishment charges.

Judge Riemer, assigned to the case after Judge Sykes left the court, addressed these disputes in a remedies order. Judge Riemer concluded that the liabilities ruling was not restricted to the West AOB. This meant that not only did the liabilities ruling invalidate the replenishment charges imposed on the East AOB, it also invalidated replenishment charges imposed on a third AOB, the Mission Creek AOB. He concluded that the Water District could not rely on Health and Safety Code section 5472, as that provision applies only to a city or a city and county. He also concluded that Howard Jarvis could recover for fiscal year 2021 because when it filed the reverse validation action for that year, it did not allege a cause of action requiring a government claim, and the parties later stipulated that Howard Jarvis could recover monetary relief for fiscal year 2021 if it prevailed on the merits.

Judge Riemer stated that the amount of refund recovery for the ratepayers Howard Jarvis represented would be measured "by the difference between what each AOB paid (or will pay) during the three fiscal years at issue and what they would have paid had the district-wide costs of replenishment during those years been allocated district-wide, plus pre-judgment interest." Further, he stated that the judgment would provide that the Water District "is permanently enjoined from continuing to collect the rates imposed during" the years at issue. The judgment awarded $13,152,831 to ratepayers in the West AOB and

11

$244,928 to ratepayers in the Mission Creek AOB, plus interest. It also stated that any replenishment charges imposed by the Water District in the future "shall comply with the requirements of Proposition 26."

## II. DISCUSSION

A. *The Water District's Appeal*

The Water District argues that the trial court erred in its liability and remedies rulings. We first address the threshold issue of standing before considering the Water District's liability arguments under Propositions 218 and 26. We then address its remedies arguments. Because the Water District filed its opening brief before we decided *Coachella IV*, which addressed many of the same issues, we focus our discussion on those arguments that were not addressed in *Coachella IV*.

### 1. Standing

The Water District contends that Howard Jarvis lacks standing. It raises—or rather, incorporates by reference—the same standing arguments it raised in *Coachella IV*.

We reject the Water District's standing argument here for the same reasons we did in *Coachella IV*. (See *Coachella IV*, *supra*, 108 Cal.App.5th at pp. 501-502.) In *Coachella IV*, the argument was that only those who were directly obligated to pay the class of Coachella Canal water rates at issue had standing to challenge them, whereas here the argument is that only those who directly pay replenishment charges have standing. However, as we noted in *Coachella IV*, "nothing in [Propositions 218 and 26] limits standing to those who are directly liable to pay a given tax." (*Id.* at p. 501.)

12

Because all that is required is "economic injury, such as '"lost money or property"'" (*ibid.*, citing *Zolly v. City of Oakland* (2022) 13 Cal.5th 780, 789), which would occur if, as here, the domestic customers Howard Jarvis represents paid the replenishment charges indirectly, Howard Jarvis has standing here.

## 2. Liability Ruling

### a. Replenishment Charge

Judge Sykes's liability ruling presents the issue of whether the Water District's replenishment charges are "taxes" as defined by the California Constitution. We asked the same question in *Coachella IV*, but about rates the Water District charged for Coachella Canal water, so we describe the relevant legal framework using much of what we said in *Coachella IV*.

"'Through a series of ballot initiatives, California voters have imposed several constitutional limitations on the ability of local governments to tax.' (*Zolly*, *supra*, 13 Cal.5th at p. 784.) The earliest of these voter initiatives, Proposition 13, was enacted in 1978 to cut local property taxes. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 836, [102 Cal.Rptr.2d 719, 14 P.3d 930] (*Apartment Association*).) '"Its principal provisions limited ad valorem property taxes to 1 percent of a property's assessed valuation and limited increases in the assessed valuation to 2 percent per year unless and until the property changed hands."' (*Ibid.*) '[T]o prevent tax savings related to real property from being offset by increases in state and local taxes,' Proposition 13 also 'required approval by two-thirds of the members of the Legislature in

order to increase state taxes' as well as 'approval by two-thirds of the local electors of a city, county, or special district in order for such a local entity to impose special taxes.' (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 258 [219 Cal.Rptr.3d 859, 397 P.3d 210].)  Proposition 13 did not define 'special district,' and in *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941], our Supreme Court held that the term was limited to governmental bodies that have the power to levy property taxes.  (*Id.* at p. 201, 182 Cal.Rptr. 324, 643 P.2d 941.)" (*Coachella IV*, *supra*, 108 Cal.App.5th at pp. 502-503.)

"In 1996, the electorate adopted Proposition 218, part of which further limited 'the authority of local governments to assess taxes and other charges on real property.' (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 10.)  Under article XIII D of the California Constitution, added by Proposition 218, only 4 types of local property taxes are allowed:  '"(1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a [property-related] fee or charge."'  (*Apartment Association*, *supra*, 24 Cal.4th at p. 837.)[6]  To limit the ways local government could raise revenue '*not* based on real property value or ownership,' Proposition 218 also added article XIII C.  (*Citizens for Fair REU Rates*, *supra*, at p. 10, italics added.)  Article XIII C provides that all taxes imposed by any 'local government' are either general taxes or special taxes, requires that a general tax be approved by a majority of the electorate (and special tax by a two-thirds

---

[6]  Undesignated article references are to the California Constitution.

14

majority), and defines the term 'local government' broadly to mean 'any county, city, city and county, . . . any special district, or any other local or regional government entity.' (Cal. Const., art. XIII C, §§ 1-2.)  Proposition 218 'specifically state[d] that "[t]he provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent."'  (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448 [79 Cal.Rptr.3d 312, 187 P.3d 37] (*Silicon Valley*), citing Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 5, p. 109.)"  (*Coachella IV*, *supra*, 108 Cal.App.5th at p. 503.)

"'Significantly, Proposition 218 did not define the term "tax."'  (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 11.)  'That definition was provided 14 years later, with the passage of Proposition 26 in November 2010.'  (*Ibid.*)  Proposition 26 defined the term 'broadly, to include "any levy, charge, or exaction of any kind imposed by a local government."'  (*Ibid.*, citing art. XIII C, § 1, subd. (e).)  'However, the new definition has seven exceptions.  A charge that satisfies an exception is, by definition, not a tax.'  (*Citizens for Fair REU Rates*, *supra*, at p. 11.)"  (*Coachella IV*, *supra*, 108 Cal.App.5th at p. 503.)

"Thus, the California Constitution currently broadly defines the term tax, requires that a tax be approved by at least a majority of voters, and carves out exceptions from the definition of a tax.  A challenge based on Propositions 218 and 26 therefore 'involves three questions:  (1) Is the [subject of the challenge] a levy, charge, or exaction imposed by a local government?; (2) Does it satisfy an exception to the definition of tax?; and (3)

If it does not, was it properly approved by the voters?' (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 12.) A levy, charge, or exaction imposed by a local government—which we will refer to simply as an exaction—that does not satisfy an exception and was not properly approved by the voters is an unconstitutional, invalid tax." (*Coachella IV*, *supra*, 108 Cal.App.5th at pp. 503-504.)

No one here contends that the replenishment charges are not exactions or that they were approved by a majority of the electorate. Accordingly, whether the replenishment charges are valid "depends solely on whether [they] satisfy an exception to the definition of a tax. 'The local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax.' (Cal. Const., art. XIII C, § 1, subd. (e), unenumerated par.) We independently review whether an exaction is a tax. (*Silicon Valley*, *supra*, 44 Cal.4th at pp. 448-449, *City of San Buenaventura v. United Water Conservation District* (2022) 79 Cal.App.5th 110, 117-119 [294 Cal.Rptr.3d 491] [*City of San Buenaventura*].)" (*Coachella IV*, *supra*, 108 Cal.App.5th at p. 504.)

The Water District relies on the exception described in article XIII C, section 1, subdivision (e)(2) (subdivision (e)(2)). Subdivision (e)(2) "provides an exception from the term 'tax' any 'charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product.'" (*Coachella IV*, *supra*, 108 Cal.App.5th at p. 507, citing Cal. Const., art. XIII C, § 1, subd. (e)(2).) We find that the exception does not apply.

16

Our Supreme Court has described subdivision (e)(2) as having both an "aggregate cost" requirement and an "allocation" requirement.  (*City of San Buenaventura*, *supra*, 3 Cal.5th at p. 1212.)  The aggregate cost requirement—that the charge imposed for the service "does not exceed the reasonable costs . . . of providing the service"—comes from the text of subdivision (e)(2) itself.  The allocation requirement comes from an unenumerated paragraph in article XIII C, section 1, subdivision (e), which states that the local government must also prove that "the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity."

(i)     Aggregate Cost Requirement

Starting with the aggregate cost requirement for the 2021 fiscal year, we note that the Water District's opening brief miscites its own evidence.  In arguing that the replenishment charges collected for the West AOB were less than the costs for operating the groundwater replenishment program there, the Water District states that it incurred $24.8 million in expenses and collected $16.5 million in replenishment charges. However, the administrative record page they cite lists those numbers for fiscal year 2020, not 2021.  The Water District makes the same error when citing the East AOB numbers as well.  Nevertheless, at the pages the Water District cites, the record shows that the replenishment charges for the 2021 fiscal year satisfy the aggregate cost requirement, as the projected expenses exceed the projected replenishment charge revenues.  The Water District projects that it will collect $17 million in replenishment

17

charges and incur $24 million in expenses for the West AOB and collect $7.9 million while spending $19.1 million in costs in the East AOB.  (See *Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 17 [determining "whether the charge imposed on ratepayers exceeds the reasonable costs of providing the relevant service" (italics omitted) by reference to projected revenues and costs].)  Howard Jarvis does not contest these projected numbers or otherwise suggest that costs do not exceed revenues.

The Water District similarly miscites its evidence for the 2022 fiscal year.  It argues, using fiscal year 2021 numbers for the West and East AOBs, that projected expenses would exceed projected replenishment charge revenue.  Nevertheless, the figures given at the cited portion of the record show that the aggregate cost requirement is satisfied for the 2022 fiscal year.  The Water District projects collecting $19.5 million in replenishment charges while incurring $23.7 million in costs for the West AOB and collecting $8.6 million while spending $14.4 million for costs in the East AOB.[7]

(ii) Allocation Requirement

To satisfy the allocation requirement, the local government must prove that "the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity."  (Art. XIII C, § 1, subd. (e), unenumerated par.)

---

[7] The record contains no figures for the 2023 fiscal year because the validation action for fiscal year 2023 was filed only after Judge Sykes had issued her liability ruling. (See ante, fn. 5.)

18

For the 2021 fiscal year, replenishment charges for the West AOB were $143.80 per acre-foot, compared to $66.00 per acre-foot for the East AOB, roughly a 2.2-to-1 ratio. For the 2022 and 2023 fiscal years, replenishment charges for the West AOB were $165.37 per acre-foot, compared to $72.27 per acre-foot for the East AOB, roughly a 2.3-to-1 ratio.

The Water District fails to satisfy the allocation requirement because its central justification for the rate disparity—that there is an unobserved barrier between the West and East AOBs that significantly impedes groundwater flow from west to east—is not reasonably supported by the record.[8]

We begin with the lay of the land. Due to the geography of the aquifer underneath the Coachella Valley, groundwater flows from the northwest to the southeast. There are three groundwater replenishment facilities in the two AOBs, two in the West AOB and one in the East AOB. The Whitewater River Groundwater Replenishment Facility, where more than 90 percent of the water meant for replenishment in the West AOB is used, is in

---

[8] The Water District states in its briefing that the water used for groundwater replenishment in the West AOB is more expensive to obtain than the water used for replenishment in the East AOB. Judge Sykes noted that the Water District did "not provide any discussion about how the increased expenses unique to the West AOB result in the specific RAC rates those customers pay" and that it did not provide "evidence to show that only the West AOB benefits from the higher costs associated with replenishing that area's groundwater." Here, the Water District does not formally rely on that purported higher cost as a justification for the disparity in replenishment charges. In any event, even assuming it is more expensive to replenish groundwater in the West AOB, if (as we discuss below) it is also true that there is no significant impediment to groundwater flow from the west to the east, then the East AOB would also benefit from the West AOB's relatively expensive groundwater replenishment.

19

the northwestern corner of the West AOB and not near the border between the West AOB and East AOB. It is also by far the oldest of the three facilities, having begun operations in 1973. The other facility in the West AOB, the Palm Desert Groundwater Replenishment Facility, is near the border between the West AOB and the East AOB and has been operational since 2019. The Thomas E. Levy Groundwater Replenishment Facility is the only such facility in the East AOB currently operating and began operations in 2009.

Stated in other terms, the central premise of the Water District's argument is that it established the West and East AOBs and set disparate replenishment charges in them because, according to it, "each benefits from its respective replenishment program, but not from replenishment funded by charges in other areas." The record does not support this view.

In 1974, the United States Department of the Interior studied the groundwater basin in what it called the upper Coachella Valley. (Stephen J. Tyley, Analog Model Study of the Ground-Water Basin of the Upper Coachella Valley, California, 1974, available at <pubs.usgs.gov/wsp/2027/report.pdf> (1974 Study).) The 1974 Study aimed to "determine the effects of imported water on ground-water levels" in the future by constructing a model that "was considered verified when the ground-water levels generated . . . approximated the historical change in water levels of the ground-water basin caused by man's activities for the period 1936-67." (1974 Study, p. 1) It sought to answer three questions: "1. Where and how can water imported from the Colorado River

20

be most efficiently recharged to the ground-water system? [¶] 2. What are the patterns of ground-water movement under influence of extractions and of recharge? [¶] 3. How would recharging Colorado River water affect the quality of the native ground water?" (1974 Study, p. 4) Although a detailed walkthrough of the entire study is not necessary here—notably, the Water District observes that the Whitewater River Groundwater Replenishment Facility has been operating since 1973 "at the site the 1974 federal study recommended"—a few of the definitions used, and calculations derived, in the 1974 Study are important for our purposes.

To begin, the 1974 Study did not look at the entire Coachella Valley aquifer. Rather, it divided the region into the upper Coachella Valley and the lower Coachella Valley and studied only the effects of groundwater replenishment in the upper Coachella Valley. (1974 Study, p. 4.) The 1974 Study drew the boundary between the upper and lower Coachella Valley at "an imaginary line extending from Point Happy northeast to the Little San Bernardino Mountains and was chosen for the following reasons: (1) North of the boundary, water levels have been declining while south of the boundary, water levels have been rising since 1949 and (2) north of the boundary, ground water is the major source of irrigation water while south of the boundary, imported water from the Colorado River is the major source of irrigation water." (1974 Study, p. 9; see also *id.* at p. 2 ["In the lower Coachella Valley concern over diminishing the ground-water supply for agricultural development prompted the construction of the Coachella Canal"]; *Coachella IV*, *supra*, 108 Cal.App.5th at pp. 492-493 [describing construction of

21

Coachella Canal and noting it began delivering Colorado River water in 1949].) The 1974 Study noted that "there is no topographic divide between the upper Coachella and the lower Coachella Valleys" and called the line an "arbitrary" one. (1974 Study, p. 4.) It also stated that the constructed "model indicated that the upper and lower valleys are within the same hydrologic system." (*Id.* at p. 2.)

The 1974 Study's terminology is important here for two reasons. First, the Water District states that "[t]he West AOB's boundaries are based on" the 1974 Study. That is, what is described in the 1974 Study as the upper Coachella Valley is also largely the West AOB, and the line dividing the upper and lower Coachella Valley is also largely the border between the West and East AOBs. Second, that boundary line is not based on preexisting geographical features. Rather, it is simply the point at which the benefit of rising groundwater levels caused by the operation of the Coachella Canal, which runs through only the lower Coachella Valley (or East AOB), stopped. It is arbitrary in that, under ordinary circumstances, the benefit of rising groundwater levels caused by the Coachella Canal would likely have stopped *somewhere* in the valley, and the line was simply drawn where that stoppage occurred.

It is possible that there is a physical barrier blocking groundwater flow from the upper to lower Coachella Valley and that that barrier is partly or wholly the reason why groundwater levels switch from declining to rising heading toward the lower Coachella Valley. However, the 1974 Study's measurements on the transmissivity of the aquifer in the model area undermine that idea. Measured in gallons per day per foot, "[t]he

22

transmissivity of an aquifer is the rate of flow of water . . . through a vertical strip of the aquifer." (1974 Study, p. 9.)  Thus, a high transmissivity means more water will flow through the measured site in the aquifer.  "To sustain municipal or agricultural production wells designed for pumping rates ranging from 50 gpm to 2,000 gpm, the hydrogeologist generally looks for an aquifer with a transmissivity ranging from 1,000 gpd per ft. (considered low) to over 100,000 gpd per ft. (considered high)."  (Thomas Harter, Groundwater Hydrology (2001), p. 11, available at < https://perma.cc/G3U9-QPP3 > [as of Nov. 18, 2025].)  As the below figure from the 1974 Study shows, the transmissivity of the aquifer is generally the lowest (below 200,000 gpd/ft) near the mountain ranges bordering the valley, higher toward the middle of the valley (approximately 300,000 gpd/ft) and highest (360,000 gpd/ft) in the area approaching the boundary line separating

the upper and lower Coachella Valley.[9] Thus, according to the 1974 Study, the portion of

the model area nearest the line separating what is now approximately the West and East

AOBs had the *highest* rate of groundwater flow. Additionally, in a separate section

discussing groundwater discharge, the 1974 Study notes that "the underflow across the

south boundary was about 50,000 acre-feet per year" until around 1949 before decreasing

to "about 45,000 acre-feet per year" in 1951 and "about 30,000 acre-feet per year" by

---

9



FIGURE 4.—Transmissivity distribution.

(1974 Study, p. 12.)

24

1967. (1974 Study, p. 24.) The reduction "was caused by a rise in water levels in the lower valley, which decreased the water-level gradient across the boundary." (*Id.* at pp. 24, 26.) Taken together, the 1974 Study's measurements of transmissivity and groundwater discharge undercut the idea that there is a natural barrier preventing or impeding groundwater flow from the upper Coachella Valley (or West AOB) to the lower Coachella Valley (or East AOB).

The Water District relies on the 1974 Study in arguing that groundwater replenishment in the West AOB does not benefit the East AOB, but that reliance is misplaced. For example, the Water District states that the 1974 Study "predicted the benefit from the Whitewater River [Groundwater Replenishment Facility] would reach no further south than the Coachella Canal," citing page 60 from the 1974 Study. On that page, the 1974 Study says that, with its model assuming replenishment beginning in 1968, "[b]y the year 2000 the recharge will have affected the entire Whitewater River subbasin south to the Coachella Canal and significantly begin to affect the Garnet Hill subbasin." (1974 Study, p. 60.) This statement does not mean that the benefits of replenishing groundwater near the Whitewater River Groundwater Replenishment Facility site would never reach south of the Coachella Canal, which runs through only the East AOB. Rather, it means that, by 2000, the benefits will have reached the Coachella Canal, and the 1974 Study elsewhere stated that its model calculations did not go past the year 2000. (1974 Study, p. 57 ["A major purpose of this study was to predict the effects of the artificial recharge in the Windy Point area on the hydrologic system of the upper

25

Coachella Valley. To predict these effects, the model was interrogated to the year 2000."].) The 1974 Study also specifically stated that further analysis with an extended model area would help measure the effects of groundwater replenishment in the 21st century: "The model analysis clearly indicates that the upper and lower valley are part of the same hydrologic system, and therefore the model should be extended to the Salton Sea. Extension of the model to the Salton Sea would provide . . . (5) a tool to predict [the] effect of recharge on the lower valley system after the year 2000." (1974 Study, p. 74.) Moreover, the 1974 Study's finding that it would take decades for replenishment to reach the Coachella Canal is unsurprising, given that the Whitewater River Groundwater Replenishment Facility is in the northwestern corner of the West AOB and that, at least at the time of the study, groundwater levels "south of the boundary . . . ha[d] been rising since 1949." (1974 Study, p. 9.)

The Water District also argues the 1974 Study's finding that groundwater levels declined north of the boundary but rose south of the boundary "suggest[ed] a geological basis for the line" and that the words "imaginary" and "arbitrary" the study used to characterize the line were "scientific terms of art." This miscites the 1974 Study. As we have noted above, not only does the 1974 Study state that "there is no topographic divide between the upper Coachella and the lower Coachella Valleys" (1974 Study, p. 4.), but the study's measurements of transmissivity and groundwater discharge undermine the idea that there is a physical barrier between the upper and lower Coachella Valley impeding groundwater flow. The 1974 Study also explained why it called the line

26

"imaginary" and "arbitrary," and the Water District offers no authorities or reasoned argument to support its claim that the words were "scientific terms of art" that have contextually specific meanings.

Beyond relying on the 1974 Study, the Water District asserts that the East and West AOBs benefit from only their own replenishment facilities by asserting that the Palm Desert Groundwater Replenishment Facility does not "provide any quantifiable benefit to the East AOB." The Water District yet again misconstrues its own evidence. Relying on a 2019 draft technical memorandum on a study the Water District requested the consulting firm Todd Groundwater to conduct, the Water District states that the Palm Desert Groundwater Replenishment Facility has reduced outflows from the West AOB into the East AOB "by approximately 12,000 [acre-feet per year]." At the page cited, however, the draft memorandum says that the amount of groundwater *inflow* into the region studied—a relatively small 20 square mile region near Palm Desert and the border between the AOBs—reduced by approximately 12,000 acre-feet per year. It also says that a "portion of this decreased inflow could be considered as a benefit to the East AOB." The evidence the Water District relies on here thus reaches a conclusion contrary to what the Water District claims.

Finally, the Water District claims that it began a separate groundwater replenishment program in the East AOB "*because* it did not benefit from replenishment" from the two facilities in the West AOB. (Bolding replaced with italics.) However, this claim is also undercut by the evidence the Water District cites. Here, the Water District

27

relies on its 2021-2022 Engineer's Report on Water Supply and Replenishment Assessment (2021-2022 Engineer's Report). That report attributes a different cause to the formation of a groundwater replenishment program in the East AOB. It states that "[*h*]*istorical declines* in groundwater levels in the eastern portion of the Whitewater River Subbasin led to [the Water District's groundwater replenishment program] for the East Whitewater River Subbasin AOB." (Italics added.) It would be implausible to attribute groundwater level decline in the East AOB to replenishment facilities in the West AOB, and the Water District states that those levels "decline[d] in the 1980s due to increased pumping." Importantly, once it is established that groundwater levels in what is now the East AOB declined in the 1980s (and did not rise until the Thomas E. Levy Groundwater Replenishment Facility became operational), unless there is data showing how much groundwater was pumped in the East AOB at that time, it would be impossible to conclude that the West AOB's replenishment efforts had no effect at all in the East AOB. Extremely high levels of groundwater pumping in the East AOB, for instance, would still have led to decline in groundwater levels there even if replenishment groundwater flowed in from the West AOB, so long as replenishment levels did not exceed pumping levels. And although the 2021-2022 Engineer's Report contains data showing the amount of groundwater pumped in the West AOB as far back as 1977, that same information for the lower Coachella Valley does not begin until 1999, a few years before the Water District designated the area as the East AOB. There is thus nothing in the 2021-2022 Engineer's Report supporting the Water District's claim that a

28

replenishment program in the East AOB was started *because* that region did not benefit from replenishment in the West AOB. Again, the evidence the Water District cites reaches a conclusion contrary to what the Water District claims.

We do not mean to suggest that groundwater replenishment in the West AOB necessarily benefits the East AOB such that no disparate allocation of costs could ever satisfy article XIII C. On this record, however, we conclude that the Water District has not satisfied its burden of proving that "the manner in which [groundwater replenishment] costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (Art. XIII C, § 1, subd. (e), unenumerated par.)

The Water District argues that the groundwater replenishment charges satisfy the allocation requirement because each of the charges are uniform within an AOB. It relies on Water Code section 31632.5, which states that the replenishment assessment "within each area of benefit shall be at a uniform rate per acre-foot." This argument is unpersuasive because satisfying a statutory requirement is not the same as satisfying a constitutional requirement, and the former does not automatically imply the latter. We therefore find that the groundwater replenishment charges for fiscal years 2021, 2022, and 2023 are unconstitutional taxes, as the trial court held.

Additionally, the Water District contends that because no customer pays their full, allocated cost of groundwater replenishment as a result of subsidies, the rate necessarily satisfies both the aggregate cost and allocation requirements. However, by providing no

29

explanation for their contentions that "[s]ubsidized rates do not offend the Constitution" or that "[t]he fact of these subsidies is dispositive" beyond a string citation to *Northern California Water Assn. v. California Water Resources Control Bd.* (2018) 20 Cal.App.5th 1204, *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, and *Citizens for Fair REU Rates*, we deem the argument forfeited. *Citizens for Fair REU Rates* does not discuss the allocation requirement at all, and the other two cases involved regulatory fees, not subdivision (e)(2). Furthermore, each of the cases determined simply whether the specific rate or fee at issue was constitutional, and none purported to create any per se rule regarding below-cost rates. Any argument that the reasoning of these complex and distinct cases should govern our analysis here thus required greater discussion than the cursory citations the Water District provided. "We are not obligated to make arguments for [parties] and may and do disregard conclusory arguments failing to disclose the reasoning by which [a party] reached the conclusions they ask us to adopt." (*KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1031.) We thus do not decide here whether rates subsidized below cost necessarily satisfy the aggregate cost and allocation requirements of subdivision (e)(2).

### b. Expenditures

The final issue raised by the Water District in challenging the liability ruling concerns expenditures. Namely, the Water District argues that the groundwater replenishment charges are expenditures of funds that are acceptable under *Webb v. City of*

*Riverside* (2018) 23 Cal.App.5th 244 and *Citizens for Fair REU Rates*. Its arguments on this issue are substantially similar to arguments it raised in *Coachella IV*. We rejected the Water District's expenditures argument in *Coachella IV* (see *Coachella IV*, *supra*, 108 Cal.App.5th at pp. 510-511), and we reject it here for the same reasons stated in *Coachella IV*. Our legal analysis of the Coachella Canal rates applies equally well here to groundwater replenishment charges.

### 3. Remedies Ruling

In challenging the trial court's remedies ruling, the Water District makes virtually all of the arguments it raised about the remedies ruling at issue in *Coachella IV*. Indeed, in raising remedies error in its opening brief, the Water District incorporates 26 pages from its opening brief in *Coachella IV*, and it restates other sections not directly incorporated. As we noted earlier, the Water District filed its opening brief in this case before we issued our decision in *Coachella IV*, and many of the same legal issues underlie both cases.

Our decision in *Coachella IV* contains a discussion of the issues that are substantially similar to the remedies arguments that the Water District raises here, even though this case concerns groundwater replenishment charges and not Coachella Canal charges. We therefore reject those arguments for the same reasons discussed in *Coachella IV*. This includes purely legal issues such as the Water District's arguments relating to the availability of refund relief (see *Coachella IV*, *supra*, 108 Cal.App.5th at p. 513), the applicability of Health and Safety Code section 5472 (see *Coachella IV*, at pp.

31

514-516), and the constitutionality of refund relief (see *id.* at pp. 516-519).[10] This also includes the Water District's arguments relating to the amount of relief the trial court awarded, for which the Water District must demonstrate an abuse of discretion (see *id.* at p. 520), and for which we find no such abuse for the same reasons. (See *id.* at pp. 520-521 ["The Water District fails to cite the applicable standard of review here. It thus unsurprisingly does not contend that Judge Riemer abused his discretion. Instead, the Water District relies on cases where courts have remanded for additional factfinding in remedies. [Citation.] The Water District has not shown that Judge Riemer exceeded the bounds of reason by taking a different approach, or that he was compelled to remand for additional factfinding. We therefore find no error in the amount of refund relief awarded."].)

---

[10] As in *Coachella IV*, we granted a request by the League of California Cities, the Association of California Water Agencies, the California Special Districts Association, the California State Association of Counties, and the California Association of Sanitation Agencies to file an amicus brief. Amici argue against the constitutionality of refund relief, as they did in *Coachella IV*, and we reject the arguments for the same reasons raised there. Amici also raise a second issue, not raised in *Coachella IV*, which we address below.

We deny the Water District's request for judicial notice of (1) various published history materials pertaining to Health and Safety Code section 5472; (2) background information pertaining to groundwater; and (3) a press release discussing a recent water conservation agreement the Water District reached with the federal government. The legislative history materials are the same ones we declined to take judicial notice of in *Coachella IV*, and the request as to the other materials is denied as unnecessary. (See *Coachella IV*, *supra*, 108 Cal.App.5th at p. 514, fn. 15.) We also deny Howard Jarvis's request for judicial notice of various documents in support of its answer to the amicus brief as unnecessary.

32

The Water District raises a few arguments we address in more detail below.  One relates to the availability of refund relief for only the 2021 fiscal year, as neither Roberts nor Howard Jarvis submitted government claims challenging that year's replenishment charges before filing suit.  Another relates to whether the trial court erred in invalidating all replenishment charges for the pertinent years—that is, not only the one applicable to the West AOB, but also those applicable to the East AOB and the Mission Creek AOB.  We also briefly address the Water District's argument about injunctive relief, which it successfully raised in *Coachella IV* but which we reject here.

a.       Availability of Refund Relief for Fiscal Year 2021

In a single paragraph, the Water District argues that because neither Roberts nor Howard Jarvis submitted government claims challenging the replenishment charges for the 2021 fiscal year, the trial court erred by nevertheless awarding Howard Jarvis monetary relief for those charges.  Amici make the same argument in a longer section of its brief.  We reject the argument.

"Subject to exceptions not applicable here, Government Code section 905 requires the presentation of 'all claims for money or damages against local public entities.' '[N]o suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim therefore has been presented to the public entity and has been acted upon . . . or has been deemed to have been rejected.'  (Gov. Code, § 945.4.)"  (*Coachella IV*, *supra*, 108 Cal.App.5th at p. 521.)

33

Neither Roberts nor Howard Jarvis submitted government claims before challenging the 2021 replenishment charges. However, when Roberts initiated the first validation action, the only cause of action was under the validation statutes, and the complaint did not seek money or damages. At the time Roberts initiated the action, then, there was no government claim violation. (See also *Coachella IV*, *supra*, 108 Cal.App.5th at p. 521 ["Because there was no claim for money or damages relating to the Class 1 rates, it did not matter that Roberts's written claim did not focus on Class 1 rates"].)

Moreover, after the second validation action had been filed and the cases consolidated, the parties executed a stipulation where the Water District "acknowledge[d] that the remedies available to" Howard Jarvis in the consolidated actions, should it prevail on the merits, would "include the relief available in traditional mandate actions, including but not limited to monetary relief in the form, as authorized by law, of a refund to ratepayers." That stipulation limited the monetary relief to the 2021 and 2022 fiscal years, but a later stipulation extended the monetary relief available to cover fiscal year 2023 as well. With the stipulation, the Water District waived its right to make the argument it now raises, as it expressly agreed to allow Howard Jarvis to seek monetary relief for the 2021 fiscal year. (See *Nevada County Office of Education v. Riles* (1983) 149 Cal.App.3d 767, 779 ["The Superintendent has in effect waived his right to attack the trial court's decision . . . by expressly defending or agreeing to the administrative and trial court action he now objects to on appeal"].) Significantly, the Water District made

the agreement while already in litigation. "The purpose of the claims statutes is not to prevent surprise, but 'to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.'" (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 738.) Having agreed to have the trial court resolve the issues underlying monetary relief, the Water District cannot now argue that enforcing the claim presentation rule would advance the rule's purpose. As Judge Riemer stated below, "under the procedural circumstances present here – multiple consolidated cases between the same parties on the same grounds, claims having been presented in the other actions, the [Water] District having already defended against the second, third, and fourth actions, and the merits of those actions having been decided against the [Water] District – the presentation of a claim after the stipulation would have served absolutely no purpose whatsoever." Amici expressly choose not to address the effect of the Water District's stipulations, stating that they "do not address the effect of the stipulation on the [Government Claims Act's] pre-suit notice requirements." We find that the Water District waived its right to attack the availability of refund relief for the 2021 fiscal year.

b.      East and Mission Creek AOBs

Also in a single paragraph, the Water District argues that the trial court erred in invalidating the replenishment charges for all three AOBs and not just the West AOB. It contends that the pleadings and the government claims forced the Water District to "guess" what AOBs would be at issue. We disagree.

35

No guessing is required to determine from the pleadings and government claims that all three AOBs would be at issue. In the government claim challenging the 2022 fiscal year replenishment charges, Howard Jarvis defined "claimants" as "all current and former water customers" of the Water District "who directly or indirectly paid" a replenishment charge imposed by the Water District "that was higher than the East Whitewater River Basin Area Benefit" rate. Moreover, the complaints challenge unlawful rates, with the term defined as the replenishment charges adopted by the Water District at certain board meetings. Nothing in the record suggests that the Water District adopted the replenishment charges for any given year across multiple board meetings. Moreover, those same complaints allege that there are three AOBs as well as the replenishment rates for each AOB.

Nothing in any of these documents suggests that Howard Jarvis sought to recover on behalf of only West AOB ratepayers or that the Water District would have to "guess" which AOBs were being challenged. To the contrary, they show that the replenishment charges for all three AOBs were at issue. The trial court accordingly did not err when it invalidated the replenishment charges for all three AOBs.[11]

---

[11] To the extent the Water District argues that the replenishment charge for the East AOB should not have been invalidated because it satisfied constitutional requirements, the argument fails, as the Water District's failure to satisfy the allocation requirement does not justify invalidating solely the West AOB's replenishment charges, but rather all the replenishment charges for all AOBs properly at issue.

### c.     Injunctive Relief

In *Coachella IV*, we held that a prohibition requiring future compliance with Proposition 218 was overbroad because although a court "'is entitled to restrain the person from committing similar or related unlawful activity,'" it "'may not issue a broad injunction to simply obey the law, thereby subjecting a person to contempt proceedings for committing at any time in the future some new violation *unrelated* to the original allegations.'" (*Coachella IV*, *supra*, 108 Cal.App.5th at p. 522, italics added.) "Proposition 218 added several sections to the California Constitution, many of which were not at issue . . . , yet the injunction expose[d] the Water District to contempt proceedings if any 'Charge' . . . violate[d] any portion of Proposition 218." (*Ibid.*)  Here, the Water District makes a similar argument:  paragraph 8 of the judgment states that any future replenishment charges the Water District imposes "shall comply with the requirements of Proposition 26."  However, because the judgment enjoins violations of Proposition 26 and not Proposition 218, we find no prejudicial error.

Unlike Proposition 218, which imposed several new restrictions on the Water District, including restrictions that were not at issue in *Coachella IV*, Proposition 26 is largely an amendment defining "tax." (See Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Proposition 26, pp. 114-115.)  The provisions not defining "tax" either concern the burden of proof and the allocation requirement—which are not substantive restrictions on conduct imposed on the Water District—or amend article XIII A, section 3, which concerns changes to state statutes that would not apply to the Water District.

We fail to discern how the Water District could comply (or fail to comply) with a definitional amendment such as Proposition 26. If a local agency such as the Water District were to enact an exaction that fails to satisfy one of the carveouts Proposition 26 provides, then it is a "tax," one that violates the California Constitution as amended by *Proposition 218* if the requisite procedures were not followed. (See, e.g., art. XIII D, § 3, subd. (a) ["No tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership except" as otherwise provided], added by Proposition 218.) Accordingly, the Water District does not demonstrate any prejudicial error from the injunctive relief awarded here. We recommend that litigants in future disputes concerning Propositions 218 and 26 frame the law around specific constitutional provisions, which may have been amended by ballot propositions, as opposed to the propositions themselves.[12]

---

[12] The Water District has submitted three letters informing us of new statutes or cases that have been enacted or decided since briefing in this appeal was completed. The new statutes either involve actions that a local agency must take in imposing certain new exactions after a court determines that previous ones violate the California Constitution (Gov. Code, § 53758.5) or create an exhaustion of administrative remedies procedure for certain future exactions (Gov. Code, §§ 53759.1-53959.2). None impact this case. In the new case, *Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2025) 110 Cal.App.5th 260, the trial court held that a water district's groundwater pumping charge did not violate the California Constitution, and the Court of Appeal affirmed. Although the case concerned a groundwater charge, the issues raised there were either not raised here or involve factually distinct circumstances.

38

B. *Howard Jarvis's Cross-Appeal*

Howard Jarvis cross-appeals Judge Sykes's demurrer ruling, which held that the entire mandate action was time-barred under the validation statutes. For the reasons discussed below, we affirm the ruling and hold that the validation statutes apply to the replenishment charges.

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

### 1.    The Validation Statutes

Howard Jarvis contends that the validation statutes do not apply to the replenishment charges. We dealt with a nearly identical issue in *Coachella I*, where the question was whether the validation statutes applied to the Water District's ad valorem property tax. (*Coachella I*, *supra*, 61 Cal.App.5th at p. 759.)

We first explained the validation statutes as follows: "'The Code of Civil Procedure provides, in sections 860 to 870, a set of accelerated in rem procedures for determining the validity of certain bonds, assessments and other agreements entered into by public agencies.' [Citation.] Commonly called the validation statutes, they allow a public agency to file an action to promptly determine the validity of any of the agency's acts that fall within the scope of their provisions. (Code Civ. Proc., § 860.) They also allow any 'interested person' to bring an action challenging the validity of such acts. (*Id.*, § 863.) Those suits are sometimes referred to as 'reverse' or 'inverse' validation actions. [Citations.]

"'If the validation statutes apply, the validation (or inverse validation) complaint must be filed within 60 days of the act to be challenged (Code Civ. Proc., §§ 860 [validation claims or actions], 863 [inverse validation claims or actions]); notice of the claim must be served on 'all interested parties . . . by publication' (*id.*, § 861); the claim or action must be given preference over other civil actions (*id.*, § 867); any appeal of the trial court's ruling must be noticed within 30 days of the notice of entry of judgment (*id.*, § 870, subd. (b)); and the judgment, if not appealed or once affirmed on appeal, is 'forever binding and conclusive . . . against the agency and against all other persons' (*id.*, § 870, subd. (a))." [Citation.]

"Importantly, if the agency does nothing, and no interested person brings a reverse validation action within 60 days, the action is deemed valid and 'become[s] immune from attack.' [Citations.] As a result, all matters 'which have been or which *could have been*

40

adjudicated in a validation action, . . . including constitutional challenges," must be "raised within the statutory limitations period in section 860 et seq. *or they are waived.*'" (*Coachella I*, *supra*, 61 Cal.App.5th at p. 767-768.)

We then noted that the validation statutes "do not specify the matters to which they apply; rather, their procedures apply to 'any matter which *under any other law* is authorized to be determined pursuant to this chapter.'" (*Coachella I*, *supra*, 61 Cal.App.5th at p. 768, citing Code Civ. Proc., § 860.) Determining whether the validation statutes apply to any particular agency action is thus "an exercise in cross-referencing." (*Coachella I*, *supra*, at p. 768.) We held that the validation statutes applied to the property tax at issue because of Water Code sections 30066 and 31702.3. (*Coachella I*, *supra*, at p. 769.) This was because Water Code section 30066 provides that the validation statutes apply to "assessments," and Water Code section 31702.3 described the property tax as an "assessment of the property." (*Coachella I*, *supra*, at pp. 769-770, citing Wat. Code, §§ 30066, 31702.3.)

2. The Replenishment Charge

The question before us now is whether the replenishment charges are subject to the validation statutes because of Water Code section 30066. We find that they are.

Water Code section 30066 provides that the validation statutes apply to actions that "determine the validity of an assessment, or of warrants, contracts, obligations, or evidences of indebtedness," and, like the "assessment of the property" at issue in *Coachella I*, the replenishment charge at issue here is an "assessment." Section 31630 of

41

the Water Code states that "[t]he Coachella Valley Water District shall have the power to levy and collect water replenishment *assessments*, as provided in this chapter, for the purpose of replenishing ground water supplies within the district" (italics added), and section 31632.5 of the Water Code says that "[b]efore July 1 of each year, the board may by resolution levy a replenishment *assessment* upon all water production during the following fiscal year within each area of benefit as determined by the board" (italics added).

This might appear to be the end of the matter, but our Supreme Court has repeatedly indicated that determining what actions the validation statutes apply to can require more than plain meaning. In *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335 (*City of Ontario*), the Court considered Government Code section 53511, which, like Water Code section 30066, was a statute specifying what actions were subject to the validation statutes. *City of Ontario* concluded in dictum that the inclusion of "contracts" in Government Code section 53511 did not mean that the validation statutes applied to *any* contract otherwise covered by the provision. Examining legislative history, the section's placement in the Government Code, and canons of statutory construction, the Court suggested that the term "contracts" should be construed "in the midst of four other terms" in the provision ("bonds," "warrants," "obligations," and "evidences of indebtedness"), "which all deal with the limited topic of a local agency's financial obligations." (*City of Ontario*, *supra*, at pp. 343-344.) Recently, in *Davis v. Fresno Unified School District* (2023) 14 Cal.5th 671 (*Davis*), the Court adopted *City of*

*Ontario*'s discussion as persuasive, "appl[ied] the rule of *noscitur a sociis*, according to which, a specific item in a statutory list of items is qualified by the overall type or subject matter characterizing the list as a whole," and held that under Government Code section 53511, "only contracts that somehow relate to government indebtedness are subject to validation." (*Davis*, *supra*, at pp. 688-689.)

For three reasons, we find that construing Water Code section 30066 as encompassing the replenishment charges does not run afoul of *City of Ontario* and *Davis*.

The first has to do with the way the term "assessment" is included in Water Code section 30066, which is unlike how the terms "contracts," "bonds," "warrants," "obligations" and "evidences of indebtedness" are included in either Water Code section 30066 or Government Code section 53511. "Assessment" in Water Code section 30066 is unique in that it is a one-item list. (Compare Wat. Code, § 30066 ["An action to determine the validity *of* an assessment, or *of* warrants, contracts, obligations, or evidences of indebtedness pursuant to this division may be brought pursuant to" the validation statutes] with Gov. Code, § 53511, subds. (a) ["A local agency may bring an action to determine the validity *of* its bonds, warrants, contracts, obligations or evidences of indebtedness pursuant to" the validation statutes] and (b) ["A local agency that issues bonds, notes, or other obligations . . . may bring a single action in the superior court of the county in which that local agency is located to determine the validity *of* the bonds, warrants, contracts, obligations, or evidences of indebtedness of the other local agencies, pursuant to" the validation statutes].) As a result, the rule of *noscitur a sociis* that our

43

Supreme Court applied to "contracts" in Government Code section 53511 has no applicability to the term "assessment" in Water Code section 30066.[13]

The second reason we construe "assessment" in Water Code section 30066 as encompassing the replenishment charges has to do with the placement of Water Code section 30066 in the Water Code. As we noted in *Coachella I*, Water Code section 30066 is "part of division 12 of the Water Code, known as the County Water District Law." (*Coachella I*, *supra*, 61 Cal.App.5th at p. 769.) The Water Code provisions authorizing the replenishment charge (Wat. Code, §§ 31630-31639) are also part of the County Water District Law. Thus, holding that the replenishment charge is not an assessment subject to the validation statutes would "ignore[] . . . the obvious interplay of" the replenishment charge provisions and Water Code section 30066. (*Coachella I*, *supra*, at p. 770; see also *Davis*, *supra*, 14 Cal.5th at p. 687 [in construing statutes, """""we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significant to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose"""""].) The inclusion of the term "assessment" in the County Water District Law as both a descriptor of the replenishment charge and as an item subject to the validation statutes suggests that the replenishment charge was intended to be subject to the validation statutes.

---

[13] We note that *Coachella I* was decided two years before our Supreme Court applied the rule of *noscitur a sociis* in *Davis*.

44

The third and final reason for our conclusion is that, by the time Water Code section 30066 was enacted, other groundwater replenishment charges had been subject to validation, so their inclusion in Water Code section 30066 was likely intended.  In *Orange County Water District v. Farnsworth* (1956) 138 Cal.App.2d 518 (*Orange County Water District*), decided seven years before Water Code section 30066 was enacted, the Court of Appeal considered the validity of a groundwater replenishment assessment imposed by a water agency.  (See *id.* at pp. 521-522 ["This is an appeal from a judgment sustaining the validity of a replenishment assessment levied by the Orange County Water District in accordance with the Orange County Water District Act"].) "'[T]he Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted'" (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 146), so we presume it was aware of *Orange County Water District* when it enacted Water Code section 30066 in 1963.

In sum, the factual similarities between *Orange County Water District* and this case, along with the grammatical structure of Water Code section 30066 and the inclusion of both Water Code section 30066 and the replenishment charge provisions in the County Water District Law, suggest to us that the Legislature intended to include items such as the replenishment charge here when it enacted Water Code section 30066.

Howard Jarvis contends the legislative history of Water Code section 30066 shows it was meant to encompass only public obligations or evidences of indebtedness. Specifically, Howard Jarvis points to three statements from the Governor's chaptered bill

45

files. (See Secretary of State, <https://www.sos.ca.gov/archives/collections/legislative-resources> ["The Governor's Office maintains files for each legislative bill signed into law (chaptered) or vetoed. These files typically contain analyses prepared by the Legislative Counsel, Attorney General, other constitutional officers, state agencies and the Governor's staff. Also available is correspondence from the bill's author as well as affected organizations and individuals."] [as of Nov. 18, 2025].)

First, the author of the bill adding Water Code section 30066 stated in a letter to the Governor that "most of the provisions of the law relating to public obligations or evidences of indebtedness [had been] provided with a method of validation" by means of the validation statutes. (Sen. Clark Bradley, letter to Governor Edmund Brown (1963-1964 Reg. Sess.) May 29, 1963, Governor's chaptered bill files, ch. 764.) Due to an "oversight," however, county water districts could not take advantage of the validation statutes, so the bill "would add Section 30066 to the Water Code in order to repair" the oversight. (*Ibid.*) Second, the author of a "Bill Memorandum" addressed to the Governor characterized the validation statutes as ones "through which the validity of public obligations could be judicially ascertained," noting that the bill "would authorize county water districts to take advantage of this law." (Legis. Counsel, Bill Memorandum to Governor Edmund Brown (1963-1964 Reg. Sess.) June 5, 1963, Governor's chaptered bill files, ch. 764.) And third, a memorandum addressed to the Governor from the Director of Water Resources stated that "[t]he power to bring validation actions with respect to district assessments, warrants, contracts, obligations or other evidences of

indebtedness will be beneficial to county water districts." (Dir. of Water Resources, memorandum to Governor Edmund Brown (1963-1964 Reg. Sess.) June 4, 1963, Governor's chaptered bill files, ch. 764.) Howard Jarvis contends that these three statements, which contain no express indication of having the validation statutes apply to items outside of public debt, show the term "assessment" in Water Code section 30066 does not refer to the replenishment charges here.

In light of the countervailing considerations discussed above, we do not view these statements as requiring a narrow construction of "assessment." As our Supreme Court noted in *City of Ontario*, by 1963, when the bill adding Water Code section 30066 was enacted, the Legislature was already expanding the scope of actions the validation statutes applied to, even though the validation statutes themselves were first enacted just two years earlier. (See *City of Ontario*, *supra*, 2 Cal.3d at pp. 340-341 ["Code of Civil Procedure sections 860 to 870 . . . were first enacted in 1961. . . . [¶] From . . . humble beginnings . . . , the validating statute appears to have grown far beyond the scope originally conceived by the [validation statute's proponent]. The change took place in 1963, with the enactment of Government Code sections 53510 and 53511."].) At bottom, to whatever extent the bill file statements might point to a narrow construction of "assessment," they are outweighed by the structure of Water Code section 30066, the proximity of that section with the replenishment charge provisions, and courts' pre-existing familiarity with determining the validity of such charges.

The remainder of Howard Jarvis's argument relies on cases construing the scope of "contracts" in the context of validation statutes. (See *Davis*, *supra*, 14 Cal.5th 671; *City of Ontario*, *supra*, 2 Cal.3d 335; *Holloway v. Showcase Realty Agents, Inc.* (2018) 22 Cal.App.5th 758, disapproved on other grounds by *San Diegans for Open Gov't v. Pub. Facilities Fin. Auth. of City of San Diego* (2019) 8 Cal.5th 733, 746, fn. 14; *California-American Water Co. v. Marina Coast Water Dist.* (2016) 2 Cal.App.5th 748; *Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13; *Santa Clarita Organization for Planning & the Environment v. Abercrombie* (2015) 240 Cal.App.4th 300.) As a result, they have little relevance here other than what we have already discussed above. Because none deal with an "assessment" or any other term that the Legislature deliberately separated from lists of public debt obligations, we find those cases distinguishable.

Howard Jarvis argues, citing *City of Ontario*, that even if the validation statutes do apply, good cause exists to excuse its failure to comply with the statute of limitations. We rejected this exact argument in *Coachella I*, a case Howard Jarvis fails to cite at all when arguing good cause. As we held there, "[*City of*] *Ontario* does not provide authority for excusing a late complaint, because it involved the summons requirement in Code of Civil Procedure section 863, a separate and distinct provision which requires any interested person bringing a reverse validation action to publish a summons in the newspaper 'within 60 days from the filing of his complaint' and establishes a mechanism for dismissing the complaint for failure to comply with the requirement. '[T]he action

48

shall be forthwith dismissed on the motion of the public agency *unless good cause for such failure is shown* by the interested person.' (Code Civ. Proc., § 863, italics added.) Thus, in [*City of*] *Ontario* it was the summons that was untimely, not the complaint, and the court found there was reason to justify the failure under the 'good cause' provision of Code of Civil Procedure section 863. ([*City of*] *Ontario*, *supra*, 2 Cal.3d at p. 346.) [¶] The validation statutes do not provide a similar 'good cause' exception to the statute of limitations." (*Coachella I*, *supra*, 61 Cal.App.5th at pp. 774-775.)

Howard Jarvis also argues that even if the replenishment charges were subject to the validation statutes, we should find the statute of limitations they impose to be equitably tolled here. We assume without deciding that the validation statutes' limitations period may be equitably tolled by fraudulent concealment, the theory Howard Jarvis relies on here. (Compare *Wolstoncroft v. County of Yolo* (2021) 68 Cal.App.5th 327, 341 ["We conclude Code of Civil Procedure section 863 constitutes a statute of limitations that is subject to equitable tolling *by express agreement of the parties*."], italics added, with *Saint Francis Memorial Hospital v. State Department of Public Health* (2020) 9 Cal.5th 710, 720 ["A court may conclude that . . . a manifest policy underlying a statute simply cannot be reconciled with permitting equitable tolling"] and *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842 ["The validating statutes should be construed so as to uphold their purpose, i.e., 'the acting agency's need to settle promptly all questions about the validity of its action.'"].)

"Equitable tolling 'halts the running of the limitations period so long as the plaintiff uses reasonable care and diligence in attempting to learn the facts that would disclose the defendant's fraud or other misconduct.'" (*Sagehorn v. Engle* (2006) 141 Cal.App.4th 452, 460.) To establish equitable tolling based on fraudulent concealment, "'a plaintiff must prove the following elements: fraudulent conduct by the defendant resulting in concealment of the operative facts, failure of the plaintiff to discover the operative facts that are the basis of its cause of action within the limitations period, and due diligence by the plaintiff until discovery of those facts.'" (*Id.* at pp. 460-461.) "Where a claim is time-barred on its face, the plaintiff must specifically plead facts that would support equitable tolling." (*Long v. Forty Niners Football Co., LLC* (2019) 33 Cal.App.5th 550, 555.)

Howard Jarvis argues that the Water District intentionally misled domestic customers into believing that they were not subject to the replenishment charges even though they paid them indirectly through their domestic water charges. The arguably misleading statements included ones on the Water District's website that "'[i]f you don't have a private well, or you pump 25-acre feet or less of water from the aquifer in a year, you don't pay the [replenishment charge].'" Because of their fraudulent concealment, Howard Jarvis argues, domestic customers that it represents were not on notice of any obligation or deadline to file suit.

However, even if making these statements would constitute fraudulent conduct—an issue we do not decide—Howard Jarvis has not adequately alleged that it or Roberts

50

exercised due diligence up through the discovery that domestic customers pay replenishment charges. Nothing in the operative pleading, for instance, describes when it or Roberts discovered that domestic customers pay replenishment charges, or what acts made that discovery or were taken before making it. Howard Jarvis does allege that Roberts did not learn about the Water District's "wrongdoing and unlawful acts" until after the Water District produced a partial administrative record in *Coachella I*. According to Howard Jarvis, that partial administrative record was produced "on or about October 25, 2019." However, in April 2019—half a year earlier—Roberts submitted a government claim demonstrating awareness that domestic customers paid replenishment charges. Roberts alleged that the Water District imposes replenishment charges "on [its] non-agricultural customers through the 'Domestic' water rates that they are charged for their monthly consumption of tap water" and that "[t]his charge is assessed through the customers' Domestic water bill." Thus, whatever "wrongdoing and unlawful acts" Roberts may have discovered in October 2019, he knew before then that domestic customers paid replenishment charges. Howard Jarvis has thus not shown that the statute of limitations imposed by the validation statutes for any fiscal year should have been equitably tolled.

Finally, Howard Jarvis argues that even if the validation statutes bar challenges to pre-fiscal year 2021 replenishment charges and equitable tolling does not apply, the claims alleged against the Water District in the third amended petition and complaint "for its ongoing tortious conduct should still stand." We deem the argument forfeited, as

Howard Jarvis fails to specify which causes of action this argument would apply to or why those causes of action could not have been brought within the validation statutes' statute of limitations. (See *Friedland v. City of Long Beach*, *supra*, 62 Cal.App.4th at pp. 846-847 ["matters which have been or which could have been adjudicated in a validation action" are waived if not timely brought in validation]; *Meridian Financial Services, Inc. v. Phan*, *supra*, 67 Cal.App.5th at p. 684.)

## III. DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

CERTIFIED FOR PUBLICATION

RAPHAEL

J.

We concur:

RAMIREZ

P. J.

McKINSTER

J.